In re J. Lloyd TOMER and Christine Tomer, Debtors.

Tamalou WILLIAMS, Trustee, Plaintiff,

v.

J. Lloyd TOMER, Massachusetts Indemnity and Life Insurance Company (MILICO), the A.L. Williams Corporation, A.L. Williams & Associates, Inc., Mapleleaf Insurance Services, Inc., First American National Securities, Inc. (FANS), ALW Marketing Corporation, and Mapleleaf Insurance Services, Inc., Defendants.

Bankruptcy No. BK 89–40634.

Adv. Nos. 90–0043 to 90–0045.

United States Bankruptcy Court, S.D. Illinois.

June 19, 1991.

Terry Sharp, Mt. Vernon, Ill., for trustee.

Steven Stanton, E. St. Louis, Ill., for debtors.

Gregory Willard and Mathew Nieman, St. Louis, Mo., for all other defendants.

## OPINION

KENNETH J. MEYERS, Bankruptcy Judge.

The trustee has filed three adversary proceedings, consolidated here for purposes of opinion, to recover insurance and securities commissions which she contends are property of the estate under the provisions of contracts existing between the debtor and the defendant companies at the time of the debtor's bankruptcy filing. Debtor J. Lloyd Tomer was, and continues to be, an agent selling policies of insurance and securities on behalf of the defendant companies.

The debtor's contracts entitled him to receive commissions from his own sales of insurance and securities as well as a percentage, known as "override commissions," from sales of other agents recruited and supervised by him. Conversely, the debtor was liable for any deficiencies resulting to the companies from the actions of these "downline agents."

The vast majority of the activity of the debtor and his sales hierarchy came from the sale of insurance products of defendant Massachusetts Indemnity and Life Insurance Company ("MILICO").[1] The MILICO products were one-year term policies for life, health, and accident insurance, normally with monthly premium payments. Commissions from the sale of these insurance policies were paid to the debtor and his sales hierarchy pursuant to a system of advances and chargebacks. Under this system, MILICO would advance a 75% commission upon an agent's submission of a policy, an amount equal to commissions on the policy's first nine months premium payments. The payment of this advance commission constituted a "loan" under the terms of the agent's contracts. Thereafter, as the insured paid premiums on the policy, the commissions earned by virtue of the premium payments were applied by the company to repay the loan.[2] However, if sufficient premiums were not paid on the policy to offset the loan—as in the case of a lapsed policy or a policy on which the application was not approved, the unpaid amount or "chargeback" was repaid by the application of commissions otherwise payable to the agent on the submission of other policies.

An agent's liability for unpaid advances was shared by agents above him in the sales hierarchy. Thus, in the event of termination of an agent in the debtor's downline hierarchy, that agent's outstanding debit balance would "roll up" to the next upline agent in the debtor's hierarchy, and so forth, until it eventually rolled up to the debtor himself, who was liable as a guarantor to repay the shortfall. Under the debtor's contracts with MILICO, the company was entitled to offset the amount of this liability against commissions otherwise payable to the debtor. The company could satisfy the debtor's obligation by reducing advances on policies submitted by the debtor and his downline hierarchy or by applying the amount of this indebtedness against commissions earned on such policies. Included in the latter category were "first-year deferred commissions"—commissions payable on premiums for months ten through twelve of the term policies, as well as "renewal commissions"—commissions on policies renewed beyond the one year term period. In addition, the contracts provided that the debtor's liability could be satisfied by offsetting any amounts owing to the debtor from related

---

1. On June 19, 1989, shortly before the debtor's bankruptcy filing on July 7, 1989, defendant Mapleleaf Insurance Services, L.P. ("Mapleleaf, L.P."), formerly Mapleleaf Insurance Services, Inc., was substituted as the servicer for MILICO policies and succeeded to the rights and liabilities of MILICO under the debtor's contracts.

The Court's references to MILICO, therefore, will include Mapleleaf, L.P., to the extent the relevant time period is after June 19, 1989.

2. The repayment of advance commissions out of subsequently earned commissions is referred to as "advance recovery."

entities entitled to indemnification under the agreements.[3]

The debtor began selling insurance and securities products in 1981 as an agent for A.L. Williams and Associates, Inc. ("Associates").[4] Associates was the general agent for MILICO with the right to sell MILICO products. Pursuant to agreements with both companies, the debtor sold MILICO insurance products as an independent contractor of Associates and MILICO. The debtor likewise sold securities or investment products pursuant to an agreement with First American National Securities, Inc. ("FANS"). FANS, unlike MILICO, did not pay advance commissions on the sale of securities. However, the debtor had "roll up" liability, as under the MILICO agreements, for amounts owed to FANS by the debtor's downline agents. In addition, commissions payable to the debtor by FANS could be offset to satisfy the debtor's liability to other related entities, including MILICO.

In 1982, the debtor advanced to the status of Regional Vice–President ("RVP") with Associates. As an RVP, the debtor became a full-time representative of the company, with the responsibility to recruit and train new agents. The debtor's RVP agreement with Associates provided for the payment of override commissions from sales of his downline agents and set forth the debtor's corresponding liability for losses caused by these agents. The debtor executed new and superseding RVP agreements in 1985 and 1986. In 1985, the debtor attained the further status of Senior Vice–President ("SVP"). The debtor's rights under the SVP agreement were cumulative to those under his RVP agreement, and certain provisions of the RVP agreement were incorporated by reference in the SVP agreement.[5]

As RVP and SVP, the debtor developed a substantial sales hierarchy with downline agents ranging from regular agents to other RVP's and SVP's.[6] These latter agents had downline hierarchies of their own, which were included as part of the debtor's larger sales hierarchy. One individual recruited by the debtor, Leroy Love, was an RVP with several agents in his sales hierarchy. In March 1989, policies written by Leroy Love and his agents lapsed, and both Love and the individuals in his downline hierarchy were terminated as agents for Associates, MILICO, and FANS.[7] The lapse of the policies written by Love and his agents resulted in a substantial roll-up liability for the debtor, which precipitated the debtor's bankruptcy filing in July 1989.

In his Chapter 7 bankruptcy petition filed July 7, 1989, the debtor stated that he had an approximate roll-up liability of $422,000 owing to Associates. The debtor further indicated that $121,784.63 had been set off by Associates prepetition from commissions otherwise payable to the debtor. The

---

3. Under the MILICO agreements, all of the named company defendants, including those with no direct contractual relationship with the debtor (e.g., The A.L. Williams Corporation and Mapleleaf Insurance Services, Inc.) were to be indemnified against any loss suffered as a result of the actions of the debtor or his downline agents.

4. In November 1989, ALW Marketing Corporation ("ALW") became the owner of the contractual rights to the A.L. Williams sales force. The general agency agreement between MILICO and Associates was amended accordingly, and no pertinent change was made concerning the parties' rights and liabilities for payment of commissions. The Court's references to Associates, therefore, will include ALW to the extent the relevant time period is after November 1989.

5. In November 1987, the debtor was promoted to the position of National Sales Director ("NSD") with Associates and became entitled to

the payment of certain bonuses. These bonus payments are not a subject of the trustee's complaints.

6. The parties' estimates concerning the number of agents in the debtor's downline hierarchy— from whose sales the debtor receives override commissions—range from 2,000 agents to 3,500 and possibly in excess of 4,800.

7. Love and his downline agents apparently wrote policies on individuals who did not exist and received advance commissions on these policies upon submission of the policy applications. When the fictitious policyholders failed to pay their monthly premiums, the artifice was discovered. MILICO terminated the agents responsible for the sham policies and sought to recover the advance commissions it had been duped into paying.

debtor did not list Associates, MILICO, nor any of the other defendant companies entitled to indemnification as creditors on his bankruptcy schedules, and none of these parties has filed a claim against the debtor's bankruptcy estate.[8]

On March 1, 1990, the trustee filed the three adversary proceedings here at issue. In No. 90–0043, the trustee seeks the turnover of commissions that were withheld by the company defendants[9] postpetition but that were attributable to insurance policies written prior to the debtor's bankruptcy filing. The trustee asserts that these commissions, which became "earned" upon the payment of premiums by the insureds postpetition, were wrongfully set off by the defendants to satisfy prepetition obligations of the debtor. Specifically, the trustee seeks the return of first year deferred commissions and renewal commissions which she contends were "vested" in the debtor under the terms of his RVP agreement, as well as commissions payable on prepetition policies that were withheld as advance recoveries in the nine months following bankruptcy.

In a closely related action, No. 90–0045, the trustee seeks a determination that commissions attributable to policy applications submitted prepetition that became earned by the payment of premiums postpetition are property of the debtor's estate. The trustee's complaint for declaratory judgment joins the debtor as well as the insurance companies as defendants. While the setoff complaint addresses monies paid or used to indemnify the company defendants, the declaratory judgment action includes monies, if any, that would be paid to the debtor postpetition as a result of prepetition submissions. The trustee contends, as in the setoff action, that first-year deferred commissions and renewal commissions on prepetition policies were "vested" in the debtor at the time of his bankruptcy filing

and, therefore, constitute property of the estate.

In the third adversary proceeding, No. 90–0044, the trustee seeks to recover as preferential transfers those commissions that were payable to the debtor during the 90 days prior to filing but that were applied by the company defendants as indemnification for loans or losses caused by the debtor or his downline hierarchy. The trustee asserts that the defendants were required to perfect their interest in the debtor's commissions under the Uniform Commercial Code ("UCC") and that, having failed to do so, the defendants received a preference as unsecured creditors when they offset the debtor's commissions in this 90 day period. The trustee's preference action is directed toward both advance commissions (payable to the debtor upon submission of a policy application by the debtor or his agents) and earned commissions (first year deferred and renewal commissions) that were retained by the companies to reimburse them for the debtor's advance recovery, chargeback, or roll-up liability.

In response to the trustee's complaints, both the debtor and the company defendants assert that the debtor's contracts with MILICO and Associates are executory contracts which have been rejected by the trustee's failure to assume under 11 U.S.C. § 365(d)(1) and that, accordingly, the trustee has forfeited any right to recover the debtor's commissions that became payable under these contracts. Assuming, *arguendo*, that the trustee has not forfeited her right to recover commissions under the contracts, the company defendants contend that the trustee is entitled only to net commissions, if any, that remain after the debtor's liabilities to the companies have been satisfied, because the debtor's right to commissions under the contracts is conditioned on first satisfying all obligations to the

---

**8.** The debtor's roll-up liability was set forth in the "Statement of Financial Affairs" portion of his bankruptcy petition. The debtor's schedules refer to this roll-up liability in Schedule B–3, which lists as "Property not otherwise scheduled" the debtor's "contingent interest in deferred commissions from A.L. Williams, ...

subject to right of setoff in favor of A.L. Williams."

**9.** The "company" defendants include MILICO, Associates, FANS, and the indemnified parties A.L. Williams Corporation and Mapleleaf Insurance Services, Inc.

company defendants.[10]  With regard to the preference complaint, the company defendants maintain that their contractual right to offset commissions otherwise owing to the debtor is not dependent on perfection under Article 9 of the UCC.

The debtor argues similarly that he has no right to commissions until the company defendants are satisfied but asserts that, once this is done, his right to any remaining commissions from prepetition policies is superior to that of the trustee because these commissions are dependent on postpetition services and are, therefore, excluded from property of the estate under 11 U.S.C. § 541(a)(6).  Because of the contractual requirements of continuing service to policyholders and the companies' right to terminate under the contracts, the debtor maintains that any commissions on prepetition policies which become payable following satisfaction of his liabilities to the company defendants belong to him rather than to the trustee.  The debtor further denies that the trustee is entitled to commissions characterized as "vested" under the RVP and SVP contracts, arguing that "vesting" is a defined contract term that is limited by the language of these agreements.

Both the company defendants and the debtor filed motions for summary judgment on the trustee's complaints, and the trustee filed a cross motion for summary judgment on the declaratory judgment complaint (adversary No. 90–0045).  At hearing on the summary judgment motions, the parties agreed that no issue of fact remained as to liability in any of the three adversary proceedings.  The parties presented argument concerning the defendants' liability for payment of commissions to the trustee, leaving the issue of calculation of damages, if any, for later determination.

### I.  Contract Provisions

At the time of the debtor's bankruptcy filing in July 1989, seven separate agreements were in effect between the parties:

(1) Massachusetts Indemnity and Life Insurance Company Agent Agreement, executed May 30, 1989 ("MILICO Agreement"); (2) Mapleleaf Insurance Services, Inc. Commission Agreement, executed May 30, 1989 ("Mapleleaf Agreement"); (3) "My Agreement with A.L. Williams & Associates, Inc.," executed May 30, 1989 ("Trademark Agreement"); (4) First American National Securities, Inc. Registered Representative's Agreement, executed July 7, 1986 ("FANS Agreement"); (5) A.L. Williams and Associates, Inc. Agreement for Independent Business of Regional Vice President, executed July 17, 1986 ("RVP Agreement"); (6) A.L. Williams and Associates, Inc. Senior Vice–President Agreement, executed October 2, 1985 ("SVP Agreement"); and (7) A.L. Williams and Associates, Inc. Agreement for Independent Business of National Sales Director, executed November 10, 1987 ("NSD Agreement").

### A.  Vesting of Commissions

Section 7 of the debtor's RVP Agreement, governing the vesting of commissions, provided in relevant part:

7.  Commissions and Vesting

A.  RVP acknowledges that [Associates] is a general agent for MILICO.... RVP acknowledges that all commissions, including advanced or earned, first-year deferred or renewal, will be paid, if at all to RVP and RVP's Sales Hierarchy directly by MILICO....  These commissions are not payable and will not be paid by [Associates].  If for any reason whatsoever MILICO ... should fail to pay commissions to RVP or RVP's Sales Hierarchy, and if such failure to pay shall not be at the request of [Associates], then RVP agrees to look solely to [MILICO] for such payment and not to [Associates].

B.  ... Nothing stated in this Agreement, nor any act or omission of [Associates] shall make [Associates] liable to RVP for any commission, it being the obligation solely of MILICO ... to pay

---

**10.**  In their responsive pleadings, the company defendants additionally assert the affirmative defenses of setoff and recoupment.  The Court will refer to these theories, where relevant, in its discussion of the conditional payment nature of the debtor's contracts.

commissions to RVP pursuant to RVP's contract with MILICO....

C. To the extent that MILICO ... follows [Associates'] request to pay RVP in accordance with this subsection 7C, *RVP is hereby vested* as to first-year deferred and renewal commissions *to which RVP is otherwise entitled,* subject to the following provisions:

(1) Vesting shall mean that RVP is entitled, notwithstanding termination of this Agreement, to receive first-year deferred and renewal commissions that become earned on Life Insurance applications submitted by RVP or RVP's Sales Hierarchy prior to such termination.

(2) Notwithstanding vesting, if there is a violation by RVP of [sections of this agreement relating to noncompete covenants, exclusive use of tradename, indemnification, and proprietary rights] or if there is an act or omission by RVP that (i) causes financial loss, liability or exposure to A.L. Williams, [Associates], MILICO, FANS, [or their agents, representatives, or policyholders], or. (ii) causes ... harm to the reputation and good name of A.L. Williams, [Associates], MILICO, or FANS (such violations, acts or omissions being collectively and individually referred to as "Divesting Event"), then RVP shall be divested upon the occurrence of a Divesting Event.

(3) Although at the time of termination, RVP may be vested because of the absence of a Divesting Event, thereafter, upon the occurrence of a Divesting Event, RVP shall no longer be vested.

(Emphasis added.) [11]

Section 10 of the RVP Agreement provided further with regard to the payment of vested commissions:

10. Death of RVP

Upon the death of RVP (1) any renewal or first year deferred commissions and overrides *to which RVP is, at the time of his death, vested pursuant to section 7,* shall be the property of RVP's Estate, (2) other than vested commissions, no commissions shall be paid RVP's Estate....

(Emphasis added.)

The debtor's SVP Agreement referred back to the vesting provisions of the RVP Agreement and contained no additional rights regarding vesting.[12] The debtor's agreements with MILICO and Mapleleaf did not provide for vesting of commissions but stated, in a preamble signed by the debtor:

22. I understand that if my MILICO Agent Agreement is terminated, I am not entitled to any further commissions, by me or other agents in my sales hierarchy, even on policies which were sold while I was an agent, *unless, and only to the extent that MILICO follows a request from [Associates] to vest certain of my commissions....*

(Emphasis added.)

The ALW Agreement similarly indicated that the vesting of commissions, if any, was governed by the debtor's RVP Agreement:

15. No Vesting

Agent's entitlement to any insurance commissions is established by the MILICO Agent Agreement and the Mapleleaf Commission Agreement. Agent is not vested as to any commissions and if this Agreement is terminated, Agent has no further right to receive any commissions.

---

**11.** Sometime after November 1, 1989, following the debtor's bankruptcy filing, the debtor executed a new RVP Agreement which superseded prior agreements. This RVP Agreement added a new part (4) to subsection 7(C): "RVP is responsible for all Debit Balance amounts of Agents in RVP's Sales Hierarchy with respect to insurance and other business submitted prior to the termination of this Agreement *and RVP's vested commissions are subject to periodic reduction to the extent of any such Debit Balance.*" (Emphasis added.)

**12.** Section 7 of the SVP Agreement, entitled "Vesting," provided: "Pursuant to subsection 9(C) of SVP's RVP Agreement, SVP is vested as to first-year and renewal commissions *to which SVP is otherwise entitled.*" (Emphasis added.) Subsection 9(C) of the RVP Agreement in effect in 1985 when the SVP Agreement was executed is substantially similar to subsection 7(C) of the 1986 RVP Agreement quoted above.

*Agent may, but has no right to be, granted certain vesting privileges under certain higher level contracts....*

(Emphasis added.)

### B. Companies' Right to Withhold Commissions

The MILICO and Mapleleaf Agreements set forth the debtor's entitlement to advance, earned, and override commissions and provided for the withholding of commissions to satisfy the agent's liabilities to the companies. Paragraph 4 of the agreements, entitled "Commission Advance and Chargeback System," described the parties' rights regarding payment and recovery of advance commissions:

Mapleleaf or [MILICO], as the case may be, will ... loan to Agent an advance against Agent's commissions (the "Advance Commission"). The Advance Commission is a loan to Agent. The outstanding balance of such loan shall be referred to as a "Debit Balance," ... and (1) as long as the Advance Commission is not reclassified as a Chargeback ..., such Debit Balance will be repaid only from commissions earned relating to the policy in respect of which such Advance Commission was paid....

MILICO Agreement, ¶ 4(A).[13]

Paragraph 4(B) of the agreements specified that advance commissions paid to an agent but not fully earned by the payment of premiums from insureds (referred to as "chargebacks") could be recovered:

1. By reducing any Advance Commission (which might otherwise be paid as contemplated by this paragraph 4) ... and applying the amount of such reduction to the payment of Agent's [Debit Balance to extent of his outstanding chargeback liability];

(2) By applying Agent's earned commissions due from Mapleleaf or [MILICO]; and

(3) By applying to the balance thereof all amounts owing to Agent from [MILICO], Mapleleaf, The A.L. Williams Corporation or any of their affiliates [or other

parties entitled to indemnification under the Agreement, referred to collectively as "Obligees"].

MILICO Agreement, ¶ 4(B). Paragraph 4(H) concluded:

H. Agent understands and agrees that *any commissions or other amounts payable to Agent* from [MILICO], Mapleleaf, The A.L. Williams Corporation or any of their affiliates ... under this Agreement ... or otherwise (and the payment thereof to Agent) *shall,* at the direction of [MILICO] or Mapleleaf, *be subject to,* and if required thereunder *be reduced* in accordance with, the Commission Advance and Chargeback System described in this paragraph 4.

(Emphasis added.)

The "roll-up" provisions in both the MILICO Agreement (paragraph 9) and the Mapleleaf Agreement (paragraph 7) likewise allowed for reduction of earned commissions to satisfy the agent's outstanding liabilities. Paragraph 9 of the MILICO Agreement, substituting the term "Field Manager" for RVP, provided:

A. If any agent, manager, field manager or other member of the sales hierarchy upon whose sales Field Manager receives or ever has received commissions ("Subordinate Agent") is terminated by or terminates his representation of [MILICO] with any Debit Balance owed to [MILICO] or Mapleleaf, such Subordinate Agent's Terminated Agent's Balance ... owing ... to Mapleleaf, [MILICO], or any other Obligees, shall be first reduced by any amounts [in Agent's escrow account] and then, to the extent Terminated Agent's Balance remains, be ... subtracted from the Field Manager's earned commission balance. *Such Subordinate Agent's Debit Balance may be recovered* from the Field Manager by Mapleleaf or [MILICO] ... *by deducting the Subordinate Agent's Debit Balance* and other amounts owing by such Subordinate Agent to Obligees *from earned first-year commissions and renewal*

---

**13.** The MILICO and Mapleleaf Agreements contained identical language except for the substitution of each company's name as appropriate in the respective agreements.

*commissions due or to become due to the Field Manager.*

. . . . .

C. To the extent that the earned commission accounts of subordinate field Managers ... reflect a net debit, [MILICO] or Mapleleaf ... *shall retain sufficient commissions otherwise payable to Field Manager to cover the sum of such debit balances.*

(Emphasis added.) [14]

In addition to these provisions for recovery of chargeback and roll-up liabilities,[15] the MILICO and Mapleleaf Agreements further outlined the companies' rights to indemnification for losses caused by the debtor or his downline agents. To secure these promises of indemnification, the debtor assigned to the respective companies:

any commissions (and advances thereon), otherwise payable to Agent by any Indemnified Party which does or may owe Agent any commissions.... Any Indemnified Party may satisfy a demand for indemnity hereunder by (1) *offsetting such Indemnified Loss against any commissions due Agent* or (2) notifying the Indemnified Party by whom commissions ... are payable *to withhold and offset commissions it may then owe Agent and pay over such amount withheld* to such Indemnified Party to satisfy such demand.

MILICO Agreement, ¶ 3(D); Mapleleaf Agreement, ¶ 3(C) (Emphasis added).

### C. Termination of Agreements

Finally, the debtor's RVP, MILICO, Mapleleaf, FANS and ALW Agreements each provided for termination of the agreements by either the agent or the respective companies at any time, with or without cause. In addition, the RVP Agreement set forth "minimum persistency requirements" for

the number of policy applications to be submitted and renewed over a period of time and specified that failure of the RVP or his sales hierarchy to comply with these standards would be grounds for termination of the Agreement.[16] The MILICO Agreement likewise emphasized the importance of the agent's continued service, providing:

Agent agrees that any deferred portion of any first-year commissions payable for services performed hereunder are payable in part as compensation for the continuing service provided to the policyholder by Agent and, therefore, except (i) as may be applied to repay Advance Commissions ... or (ii) *as may be otherwise payable to Agent after termination in accordance with Commission Schedules agreed upon from time to time by [MILICO] and [Associates]* ..., no commissions or other compensation (including the deferred portion of first-year commissions or renewal commissions) shall be paid to or accrued by Agent subsequent to the termination of this Agreement.

MILICO Agreement, ¶ 2(C) (emphasis added); *see also* Mapleleaf Agreement, ¶ 2(C).

### II. Assumption or Rejection of the Debtor's Contracts

Preliminarily, the company defendants and the debtor argue that the trustee can claim no rights under the debtor's contracts because the contracts are executory and have been rejected by the trustee's failure to assume under 11 U.S.C. § 365(a). The trustee counters that the agreements are not executory concerning the debtor's right to receive commissions payable on prepetition policies which were vested in the debtor as of the date of filing.

---

**14.** This language is identical to that found in paragraph 7(C) of the Mapleleaf Agreement except for the substitution of each company's name where appropriate.

**15.** The FANS Agreement, like the MILICO and Mapleleaf Agreements, provided for payment of an agent's liability to FANS, including roll-up liability, by the deduction of such amounts from commissions or other money "then or thereafter

owed by FANS to Representative." FANS Agreement, Art. 3.4; *see* Art. 3.5(j).

**16.** The ALW Agreement similarly provided that Associates could set minimum standards for "sales, persistency, and recruiting" and that failure to comply with these standards would be a breach of the Agreement which could result in its termination. ALW Agreement, ¶ 9(A).

■ It is uncontested that the trustee took no action to assume the debtor's contracts within 60 days of the order for relief so that the contracts must be deemed rejected under 11 U.S.C. § 365(d)(1). Indeed, because of the personal services nature of the contracts, the trustee would be precluded from assuming the contracts, without the parties' consent, so as to be entitled to commissions on policies submitted by the debtor postpetition. *See* 11 U.S.C. § 365(c)(1). By her complaints, however, the trustee makes no claim to commissions payable on postpetition policies; rather, she seeks only commissions resulting from prepetition submissions to which the debtor was entitled on the date of filing.

■ A debtor's claim to money owed for prepetition services under a personal services contract is an asset of the debtor's estate which passes to the trustee, regardless of whether the trustee later assumes or rejects the contract. Stated otherwise, the issue of assumption or rejection of such contracts relates only to those aspects of the contracts which remain unfulfilled as of the date the petition is filed. *Delightful Music Ltd. v. Taylor*, 913 F.2d 102 (3rd Cir.1990). While rejection of the debtor's contracts here constituted a breach of the contracts as of the date immediately preceding the filing of the bankruptcy petition (*see* 11 U.S.C. § 365(g)(1)), such rejection was not equivalent to rescission and does not require the undoing or reversal of already executed portions of the contracts. *In re Executive Technology Data Services*, 79 B.R. 276 (Bankr.E.D.Mich.1979). Rather, the executed portions of the contracts remain intact, and property rights acquired under the contracts prior to filing became property of the estate despite the trustee's rejection of unperformed obligations of the contracts.

■ Commissions sought by the trustee in her setoff action (renewal and first-year deferred commissions on prepetition policies) will be paid to the debtor postpetition

as policyholders make their monthly premium payments. However, the debtor's right to these commissions, if any, accrued when the policy applications were submitted prior to his bankruptcy filing. While the contracts contemplate that the debtor will provide continuing service to policyholders to gain entitlement to future commissions, the vesting provision relied upon by the trustee—section 7(C) of the RVP Agreement—is not conditioned on continuing service but makes provision for payment of vested commissions following termination of the contracts. Thus, despite the companies' right to terminate the contracts if the debtor fails to meet persistency goals and provide continuing service to policyholders, the debtor's rights under section 7(C) are not dependent on the contracts remaining in force.

It was not necessary for the trustee to assume the debtor's contracts in order to claim the commissions to which the debtor was entitled on the date of filing, and the Court, accordingly, rejects the defendants' arguments to this effect.[17]

### III. Commissions Withheld Postpetition

The company defendants and the debtor contend that even if the trustee retained her right to the debtor's commissions under the contracts, this right is limited to net commissions remaining after the companies' liabilities are satisfied because of the conditional payment nature of the contracts. The debtor joins in this argument but asserts further that the trustee's claim to so-called "vested" commissions under the RVP Agreement is illusory because of the limitations imposed by that agreement and the corresponding provisions of the MILICO and Mapleleaf Agreements.

■ It is axiomatic that the trustee, asserting the rights of the debtor in this case, stands in the shoes of the debtor and is limited to those rights that existed in the

---

**17.** In addition to first-year deferred and renewal commissions claimed under the vesting provision of section 7(C), the trustee seeks commissions payable on prepetition policies that were withheld as advance recoveries in the nine months following bankruptcy. The Court will address the trustee's claim to these commissions in its discussion of the company defendants' right to withhold commissions under the contracts, *infra*.

debtor at the commencement of his bankruptcy case. *See* 11 U.S.C. § 541(a)(1); 4 *Collier on Bankruptcy,* ¶ 541.01, at 541–6 (15th ed. 1991). The debtor's rights are defined by his contracts with the companies, and the trustee acquired these rights subject to the conditions and obligations of the contracts.

### A. Entitlement to Commissions

In her setoff complaint, the trustee seeks to recover both first-year deferred and renewal commissions, which she claims as vested under the RVP Agreement, and commissions on prepetition policies withheld as advance recoveries in the first nine months following bankruptcy, which were not vested. With regard to these latter commissions, the trustee focuses on contract language that characterizes amounts advanced to an agent as "loans" and provides for repayment of the agent's indebtedness out of future commissions. The trustee argues that the debtor's arrangement with the companies was tantamount to accounts receivable financing, whereby the companies made loans to the debtor in the form of advance commissions and secured these loans with the debtor's future commissions. The trustee contends that the company defendants were required to file financing statements to perfect their security interests and that, having failed to do so, these defendants have no greater claim to the debtor's commissions than other unsecured creditors of the debtor.

■ The trustee's position, while novel, is contrary to both the language of the debtor's contracts and the rule that the trustee takes a debtor's rights as they exist upon filing subject to all conditions and limitations. The debtor's entitlement to commissions is defined by the MILICO and Mapleleaf Agreements, which provide generally that the companies may recover amounts owed by the debtor (including advances, chargebacks, and roll-ups) from earned commissions (commissions generat-

ed as premiums are paid) before the debtor himself becomes entitled to commission payments. Specifically, paragraph 4(A) provides for recovery of advances, made to an agent upon submission of a policy, out of the first nine months premium payments on that policy. While characterized as a "loan," the advances are actually advance compensation or prepayments on commissions that will be generated from the policy. The agent, having already received commissions on the policy, is not entitled to further commissions until the advance commission is repaid in full.

■ The MILICO and Mapleleaf contracts contain no language giving the debtor a right to, or interest in, the first nine months commission payments on a policy. Rather, paragraph 4(A) specifies that such amounts are to be applied by the companies to repay advances. Because the debtor had no property right or entitlement to such commissions, he was unable to grant the companies a security interest in the commissions, and the trustee's analogy to accounts receivable financing breaks down. The companies, by their contracts, retained the right to commissions accruing during the first nine months of a policy, and this right cannot be characterized as a "security interest" requiring perfection under the UCC. *See In re Sherman,* 627 F.2d 594 (2d Cir.1980): insurance company's right to retain commissions otherwise due to the bankrupt against money advanced by the company was not a security interest in a contract right.[18] Since the debtor had no right to commissions on prepetition policies that were withheld as advance recoveries in the nine months following bankruptcy, the trustee cannot recover these commissions. The Court, accordingly, denies the relief sought by the trustee's setoff complaint as to such commissions.

■ The trustee's further claim to first-year deferred and renewal commissions on prepetition policies is based on the vesting

---

**18.** The *Sherman* court, discussing another issue in the case, noted the longstanding rule that, in the absence of a specific agreement to the contrary, a commission salesman who receives advances on account of anticipated commissions is not personally liable for repayment of the advances. In the present case, the characterization of the debtor's advances as "loans" constitutes such an agreement, making the debtor personally liable for any shortfall.

provision of section 7(C) of the debtor's RVP Agreement. This section provides for vesting as to first-year deferred commissions and renewal commissions earned on policies submitted prior to termination of the agreement, but specifically limits this vesting right to those commissions "to which the RVP [debtor] is otherwise entitled." As set forth in sections 7(A) and (B) immediately preceding the vesting provision, commissions are paid only by MILICO and Mapleleaf pursuant to the RVP's contracts with those companies. The debtor's right to vested commissions is thus qualified by the provisions of the MILICO and Mapleleaf Agreements, which define and limit the debtor's entitlement to commissions.

As noted above, paragraph 4 of the MILICO and Mapleleaf Agreements allows the companies to recover amounts owed by the debtor—whether advance, chargeback or roll-up liabilities—out of earned commissions before the debtor becomes entitled to commission payments. Paragraph 4(B) specifically provides for recovery of chargebacks—on policies that do not "pay out" from policyholder premiums—by the offsetting of commissions earned on other policies. Paragraph 9 of the MILICO Agreement further allows the companies to reduce earned and renewal commissions that would otherwise be paid to an RVP to cover the RVP's roll-up liability resulting from actions of his downline agents. These provisions, in addition to the indemnification provisions of the MILICO and Mapleleaf Agreements, show conclusively that the debtor has no entitlement to commissions from the company defendants unless and until his liabilities to them are satisfied. Under the "otherwise entitled" language of section 7(C), then, the debtor's right to vesting of earned and renewal commissions applies only to commissions that accrue following satisfaction of these liabilities.

The trustee essentially ignores this caveat to the debtor's vesting rights, arguing that the debtor—and thus the trustee—is "entitled" to all commissions generated on prepetition policies subsequent to the debtor's filing without regard for the liabilities imposed by the contracts. However, the trustee, like the debtor, is bound by the conditions of the contracts limiting the debtor's right to vested commissions. The MILICO and Mapleleaf Agreements, setting forth entitlement to commissions, repeatedly condition the payment of commissions on satisfaction of the debtor's liabilities. *See* MILICO Agreement, ¶ 4(H) (commissions are "subject to" and may "be reduced" to repay agent's debit balance); ¶ 9(A) (RVP's debit balance may "be recovered" by MILICO "by deducting" such indebtedness from earned commissions); ¶ 9(C) (MILICO "shall retain" commissions otherwise payable to RVP to cover debit balance); ¶ 3(D) (indemnified party may "offset" indemnified loss against any commissions due agent). The debtor, therefore, is not vested as to first-year deferred and renewal commissions on prepetition policies following bankruptcy until he becomes entitled to them upon satisfaction of his indebtedness to the companies.

The Court finds no merit in the trustee's argument that the companies' withholding of commissions constituted an improper setoff under 11 U.S.C. § 553 because the "debts" offset (the debtor's prepetition obligation to the companies and the companies' obligation to pay commissions as they became earned following bankruptcy) were not mutual debts. Since, under the contracts, the debtor's right to commissions did not arise until his indebtedness to the companies had been satisfied, the companies had no obligation to the debtor for payment of commissions so long as he had an outstanding liability to them. Consequently, the companies' withholding of commissions pursuant to their contracts with the debtor did not constitute the offsetting of prepetition obligations against postpetition debts.

The Court additionally rejects the trustee's assertion that the companies were required, under the reasoning of *Continental American Life Insurance Co. v. Griffin*, 251 Ga. 412, 306 S.E.2d 285 (1983), to file financing statements to perfect their so-called contractual right of setoff in or-

der to prevail against the trustee as hypothetical lien creditor. *See* 11 U.S.C. § 544. The *Griffin* court, in a priority dispute between a third party creditor holding a perfected security interest in commissions that had been retained by the debtor's employer (an insurance company) to offset the debtor's obligations to the company, ruled that the employer's claim of setoff, which had not been perfected by filing under the UCC, was subordinate to the third party creditor's perfected security interest.

The *Griffin* opinion does not set forth the contract provisions governing the debtor's entitlement to commissions or the company's right of setoff, and it is unclear whether the debtor's right to commissions was conditioned on payment of his obligations to the company as in this case. As discussed above, the companies' relationship to the debtor here was not that of a creditor holding security for a debt. To the extent, however, that *Griffin* holds that an insurance company must file under the UCC in order to preserve its contractual right to recover advances made to its agents *vis a vis* lien creditors such as a trustee in bankruptcy, the Court disagrees. *See also First National Bank of Fayetteville v. Massachusetts General Life Insurance Co.*, 296 Ark. 28, 752 S.W.2d 1 (1988). Courts have uniformly held, albeit under various legal theories, that when a debtor's right to commissions under an agency contract with an insurance company is subject to satisfaction of his liabilities to the company, the bankruptcy trustee's right to commissions is likewise limited. *See, generally, In re Sherman*, 627 F.2d 594 (2d Cir.1980); *Wiley v. Public Investors Life Insurance Co.*, 498 F.2d 101 (5th Cir.1974); *Mutual Trust Life Insurance Co. v. Wemyss*, 309 F.Supp. 1221 (D.Me.1970); *American Family Life Assurance Co. v. Parker*, 9 B.R. 447 (Bankr.M.D.Ga.1981). The Court finds, therefore, that the company defendants have a superior right to commissions generated on the debtor's prepetition policies to the extent necessary to satisfy the debtor's liabilities, and these rights are not defeated by the trustee's strong arm powers under 11 U.S.C. § 544.

■■■■ At hearing on their summary judgment motion, the company defendants emphasized the ongoing nature of the relationship between the debtor and the companies and asserted that, before the trustee would be entitled to any commissions on prepetition policies, they were entitled to recover not only amounts owing to them as of the date of the debtor's bankruptcy filing but also liabilities accruing since that time. It is fundamental that the filing of a Chapter 7 bankruptcy petition "draws a line" defining both the debtor's obligations that may be discharged in bankruptcy and the debtor's property that is subject to distribution to creditors. *See* 11 U.S.C. §§ 727(b), 541. Since this determination must be made as of the date of filing, prepetition property cannot be used to pay postpetition debts. Thus, commissions generated on the debtor's prepetition policies are subject to reduction only to the extent of liabilities existing at petition date and not liabilities that accrued under the contracts as a result of the debtor's postpetition activities.

■■■ It is undetermined at this point the extent to which the debtor's roll-up liability of approximately $422,000 owing to Associates on the date of filing will be reduced by first-year deferred and renewal commissions that have been or will be paid on prepetition policies. If, in fact, commissions on these policies are insufficient to satisfy this liability, the remainder of the indebtedness owing to the companies will be discharged in the debtor's bankruptcy proceeding just as any other prepetition debt.[19] If, on the other hand, the debtor's prepetition liability is completely repaid by such commissions, then any subsequently accruing commissions must be paid over to the trustee as property of the estate to the extent the debtor was entitled to them at the time of filing his bankruptcy petition.

---

19. While the companies, under this scenario, would be unsecured creditors in the debtor's bankruptcy proceeding, they have filed no proof of claim and will be precluded from sharing in the assets of the estate, if any. *See* 11 U.S.C. §§ 726(a), 501.

## B. Vesting Right

The debtor argues that, even if there are sufficient deferred and renewal commissions on prepetition policies to satisfy his liability to the companies, his right to any remaining commissions is superior to that claimed by the trustee under the vesting provision of section 7(C). The debtor observes that only MILICO and Mapleleaf pay commissions to the debtor and that Associates has no responsibility for payment of commissions. Since neither the MILICO or Mapleleaf Agreements provide for vesting of commissions, the debtor asserts that any right to vesting provided by the RVP Agreement with Associates is illusory because the debtor could not sue Associates to get payment of vested commissions.

Despite the somewhat circuitous procedure set forth by the agreements for payment of vested commissions, the Court finds that vesting is a *bona fide* right under the RVP Agreement that is subject to enforcement by the debtor and thus the trustee. While commissions are paid only by MILICO and Mapleleaf as the servicer for policies sold by the individual agents, Associates—as general agent—plays a role in setting commission schedules determining the amount of such payment. *See* MILICO Agreement, ¶ 2(C). As an inducement to greater persistency and recruiting of downline agents, Associates grants the privilege of vesting to higher level agents such as RVP's and SVP's. The MILICO and Mapleleaf Agreements do not themselves provide for vesting; however, they recognize that commissions may be vested by Associates and provide for payment of such commissions at Associates' request. *See* MILICO and Mapleleaf Agreement preamble, ¶ 22.

The debtor points to the beginning phrase of section 7(C)—"[t]o the extent that MILICO ... follows [Associates'] request to pay RVP in accordance with this subsection"—as evidence of the tenuous nature of the RVP's vesting right. This language, rather than limiting the RVP's right to vesting, merely describes the procedure whereby Associates makes the de-

termination concerning vesting and conveys this determination to MILICO or Mapleleaf to make the actual payment. There is no indication that vested commissions would not be paid pursuant to Associates' request or that vesting is discretionary with MILICO and Mapleleaf.

Vesting under section 7(C) gives the debtor standing to make a claim for first-year deferred and renewal commissions following termination of his contracts with the companies. If, in fact, Associates did not act to secure the payment of vested commissions from MILICO and Mapleleaf, the debtor would have the right under the RVP Agreement to require Associates to make the appropriate request. The Court, therefore, rejects the debtor's argument and finds that the trustee has a valid claim to vested commissions under section 7(C).

The debtor makes the further argument that the personal service requirements of his contracts with Associates and MILICO preclude the inclusion of vested commissions as property of the estate. Section 541(a)(6) of the Code excepts from the debtor's estate any proceeds or profits from estate property that "are earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6). The debtor concedes that his contract rights are property of the estate but maintains that earnings from these contracts are excluded because they are dependent on the performance of personal services.

The debtor notes that policies sold by him are for term insurance and asserts that it is necessary to continue servicing accounts after the initial sale not only to ensure that the companies get paid in full for all twelve months of a policy but also to gain renewals of the policies upon expiration of the year's term. The debtor has further responsibilities as an RVP to supervise his downline agents so that they will continue to solicit and secure the payment and renewal of term policies. Since any of his contracts with the companies can be terminated if he fails to meet these service requirements, the debtor contends that his right to payment under the contracts de-

pends on the contracts remaining in force and thus on his continued service to policyholders postpetition. The debtor concludes that there is no truly vested right to commissions under the contracts and that first-year deferred and renewal commissions that accrue subsequent to bankruptcy on prepetition policies must be paid to him as postpetition earnings.

■ The Court takes issue with the premise of the debtor's argument—that his right to payment under the contracts is dependent on his continued personal service. Section 7(C) expressly provides for the payment of vested commissions following termination of the contracts. Indeed, section 10 of the RVP contract provides for the payment of vested commissions upon an RVP's death, at which time no further personal service is possible. Even if the debtor's contracts were terminated for failure to meet the personal service requirements of the contracts, the debtor would nevertheless retain his right to payment of vested commissions on policies sold prior to termination.

The debtor in his argument fails to make a distinction between "termination" of the contracts for inadequate service to policyholders and "divestment" of all rights under section 7(C) because of an act prohibited by the contracts. Subsections (2) and (3) of that section specifically provide for divestment of the debtor's right to commissions for violation of certain contract provisions—concerning noncompetition, unauthorized use of tradename, indemnification, and proprietary rights—or for acts by the RVP that cause harm or financial loss to Associates. These "divesting events", however, consist of affirmative acts and do not result from the debtor's failure to meet contract requirements for service to policyholders and supervision of downline agents. The Court thus finds no merit in the debtor's contention that commissions vested under section 7(C) are dependent on his continued personal service so as to be payable to him as postpetition earnings.

While the debtor is undoubtedly correct that only continued service will bring full value to prepetition accounts, it does not follow that the owners of policies written prior to bankruptcy would stop paying premiums or fail to renew if the debtor or his agents no longer called on them. The trustee does not request, and the Court could not require, that the debtor perform postpetition services to gain the greatest possible payout and renewal of prepetition policies and so enhance the value of the debtor's property interest in vested commissions. Rather, the trustee seeks only those first-year deferred and renewal commissions that continue to be paid on prepetition policies subsequent to bankruptcy. Because the debtor need not perform further service for such commissions to be paid and because the debtor's right to them accrued prior to bankruptcy, payment of these commissions to the trustee for the benefit of creditors will not impair the debtor's fresh start following bankruptcy, and the trustee is entitled to these commissions as property of the debtor's bankruptcy estate.

The debtor cites the case of *In re Kervin*, 19 B.R. 190 (Bankr.S.D.Ala.1982), as showing that payment of vested commissions is dependent on the performance of personal services after bankruptcy. *Kervin*, however, is distinguishable on its facts. The contract in *Kervin* allowed for the payment of a "service fee" on renewal premiums paid by insureds if, in fact, the agent had produced a required amount of new business in the preceding month. The contract contained a further caveat that "compensation under the contract ... was to be paid only while the agent was actively producing and servicing business thereunder." 19 B.R. at 192. The court found that the debtor's right to renewal premiums was contingent on his generation of new business and his providing policyholder service and ruled that the debtor's commissions on renewals which accrued after bankruptcy were excluded from property of the estate under § 541(a)(6).

The debtor's contracts here, by contrast, provide for vesting of commissions subject only to divestment upon the occurrence of certain "divesting events." Rather than requiring further action by the debtor, his

contracts require merely that he refrain from committing acts specified in section 7(C)(2) that would cause him to be divested of his right to commissions. While the debtor's MILICO and ALW Agreements stress the importance of continuing service to policyholders and indicate that commissions will not be paid after termination, they recognize an exception to this rule in the case of commissions vested by Associates under the RVP Agreement. MILICO Agreement preamble, ¶ 22; ALW Agreement, ¶ 15; *see also* MILICO Agreement, ¶ 2(C). The debtor's contracts, then, differ from the *Kervin* contract in that the debtor here is entitled to commissions on prepetition policies to the extent that policyholders continue to make premium payments—not to the extent that he generates new business following bankruptcy.

■ There is no allegation that the debtor has committed any act resulting in divestment as to commissions on policies sold prior to bankruptcy. If, in fact, such divesting act occurs, the trustee would be entitled to first-year deferred and renewal commissions accruing from the time of filing until the date of divestment. This presupposes, of course, that the debtor's liability to the companies that existed at petition date has been first satisfied out of commissions payable on prepetition policies.

With regard to the trustee's complaints concerning commissions withheld by the companies postpetition, the Court finds in favor of the companies and against the trustee on both the setoff and declaratory judgment complaints (Adversary Nos. 90–0043, 90–0045). The Court further finds for the trustee and against the debtor on the declaratory judgment complaint (Adversary No. 90–0045). As there are no genuine issues of material fact concerning the parties' liability on these complaints, the Court grants the companies' motion for summary judgment in both actions, with the caveat that the companies must pay to the trustee any commissions that they have retained in excess of the amount of the debtor's liability existing on the date of bankruptcy. The Court further grants the trustee's motion for summary judgment in the declaratory judgment action with regard to the debtor and denies the debtor's motion for summary judgment.

### IV. Commissions Withheld Prepetition

■ The trustee by her preference action seeks to recover commissions that were payable to the debtor during the 90 days prior to bankruptcy which the companies withheld to apply to losses created by the debtor or his downline agents. The debtor was liable under the contracts for these losses and was entitled to no commissions—whether advance, first-year deferred or renewal commissions—until this liability was paid in full. Since the debtor had no entitlement to commissions during this prepetition period during which he had a continuing liability to the companies, the companies' withholding of commissions did not constitute a "transfer" of the debtor's property that could be recovered by the trustee as a preference under 11 U.S.C. § 547. As discussed above, the companies' status under the debtor's contracts was not that of a creditor holding security for a debt, and the companies were not required to file under the UCC in order to protect their superior claim to these commissions.

The Court, accordingly, finds for the companies and against the trustee on her preference complaint (Adversary No. 90–0044). There being no issue of material fact, the Court grants the companies' motion for summary judgment as to this action.

In accordance with the Court's findings herein, the company defendants are directed, within 30 days, to file with the Court an accounting of (1) the amount of commissions on prepetition policies of the debtor and his downline hierarchy that have been withheld by the companies postpetition; (2) the amount of the debtor's liability to the companies that existed on the date of bankruptcy; and (3) the amount, if any, of commissions attributable to prepetition policies that have been paid to the debtor postpetition. To the extent that the companies' accounting shows that commissions on prepetition policies have been withheld by the companies in excess of the debtor's liability existing on the date of filing or have been

paid to the debtor, the trustee shall take such appropriate action as may be necessary to recover these amounts.