**In re J. Lloyd TOMER and Christine Tomer, Debtors.**

**Tamalou WILLIAMS, Trustee, Plaintiff,**

**v.**

**J. Lloyd TOMER, Massachusetts Indemnity and Life Insurance Company, the A.L. Williams & Associates, Inc., Mapleleaf Insurance Services, Inc., First American National Securities, Inc., ALW Marketing Corporation and Mapleleaf Insurance Services, L.P., Defendants.**

**Bankruptcy No. 89–40634 On Appeal. Nos. 91–CV–4216–JLF, 91–CV–4220–JLF and 91–CV–4198–JLF. Adv. Nos. 90–0043 to 90–0045.**

United States District Court, S.D. Illinois.

Nov. 6, 1992.

Steven T. Stanton, Carr, Korein, Tillery, Kunin, Montroy, Glass & Bogard, East St. Louis, Ill., for debtors.

Matthew Niemann, Joe Cologiovanni, Bryan Cave, St. Louis, Mo., for appellants.

463

Terrell L. Sharp, Mt. Vernon, Ill., for trustee Tamalou Williams.

## OPINION

FOREMAN, Senior District Judge:

Before the Court are three appeals from an Order entered by the Bankruptcy Court for the Southern District of Illinois on June 19, 1991. *See In re Tomer*, 128 B.R. 746 (Bankr.S.D.Ill.1991). The order was entered in a case or proceeding referred to the bankruptcy judge under 28 U.S.C. § 157 (1988). Thus, this Court has jurisdiction to hear the appeals under 28 U.S.C. §§ 158, 1334. The three appeals will be consolidated for purposes of this opinion.[1]

## I.  FACTS

The debtor, J. Lloyd Tomer ("Tomer"), is engaged in the business of selling insurance policies and securities. He began as an agent for A.L. Williams & Associates ("A.L. Williams"),[2] and moved up the ranks to become a Regional Vice–President, Senior Vice–President, and ultimately a National Sales Director. *In re Tomer*, 128 B.R. at 750. At each promotion, Tomer became responsible for the training and supervision of other agents. *Id.* As part of his compensation for training and supervising the "downline agents," Tomer received a small commission for each policy a downline agent would write. The commission was called an override commission. *Id.* at 749.

A.L. Williams was a general agent for Massachusetts Indemnity and Life Insurance Company ("MILICO"). Thus, the vast majority of Tomer's business consisted of selling MILICO products.[3] Tomer also sold securities and other investment products pursuant to an agreement with First American National Securities, Inc. ("FANS"). *Id.* at 750.

Whenever Tomer or one of his downline agents sold a MILICO policy, Tomer and the agent would receive an advance equivalent to 75% of the annual commission (*i.e.*, the commission due on 9 months of premiums) on the policy. The payment of this advance was denoted as a "loan" under the terms of the agent's contracts. As the insured paid premiums on the policy, MILICO would withhold the commissions earned by these premiums to repay the advance, until the tenth month when commissions would be paid as earned. If the policy was canceled, or if the premiums on the policy were not paid, MILICO would deduct the commission on the unearned premium from the commissions otherwise payable to Tomer and his downline agents. This procedure is called a "chargeback." *Id.* at 749.

Under the terms of the agreements with A.L. Williams and MILICO, Tomer was also liable for unearned advances made to his downline agents in the event that the downline agents resigned or terminated. If this occurred, that agent's outstanding debit balance would "roll-up" to the next upline agent in the hierarchy, and so forth, until it eventually rolled up to an agent in the position of the debtor. That person would then be liable as a guarantor to repay the shortfall. This liability is called "roll-up liability." *Id.*

Under Tomer's contracts with MILICO, the company was entitled to deduct the amount of this liability against commissions which were otherwise due Tomer. The company could do this by reducing advances on policies submitted by Tomer (and his downline hierarchy), or by applying the amount of the indebtedness against

---

1.  The Debtor, Mr. Tomer, has filed an additional appeal, Civil No. 92–4027, on January 17, 1992; that appeal is not ripe for review.

2.  In November 1989, ALW Marketing Corporation ("ALW") became the owner of the contractual rights to the A.L. Williams sales force. The general agency agreement between MILICO and A.L. Williams was amended accordingly, and there is no effect on the three appeals as a result

of this change. *In re Tomer*, 128 B.R. at 750, n. 4.

3.  On June 19, 1989, Mapleleaf Insurance Services, L.P., became the servicer for MILICO policies; this change does not affect the substance of the appeals. References to MILICO include Mapleleaf Services to the extent that the relevant time period is after June 19, 1989. *In re Tomer*, 128 B.R. at 749, n. 1.

commissions earned on such policies.[4] The contracts also provided that this liability could be satisfied by deducting amounts owed to the debtor from other entities entitled to indemnification under the contracts.[5] *Id.* at 749–50.

In 1989, Tomer had a substantial number of agents in his sales hierarchy. One of those agents, Leroy Love, was a Regional Vice–President. Thus, Love also had a number of agents in his sales hierarchy. In March 1989, a number of policies written by Love and his downline agents lapsed. Love evidently wrote policies on individuals who did not exist and received advance commissions on these policies upon submission of the policy applications. When the ploy was discovered, Love and his agents were terminated. *Id.* at 750.

The lapse of the policies left Tomer facing substantial roll-up liability. On July 9, 1989, Tomer filed a Chapter 7 bankruptcy petition. In his petition, the debtor stated that he had an approximate roll-up liability of $422,000.00 owing to A.L. Williams; further, the debtor noted that $121,784.63 had been deducted by A.L. Williams prepetition from commissions otherwise payable to the debtor. None of the defendant companies were listed as creditors on debtor's petition, and none of them has filed a claim against the debtor's bankruptcy estate. *Id.* at 750–51.

At issue in all three appeals is the entitlement to commissions paid after the bankruptcy on insurance policies issued prior to the bankruptcy. The Bankruptcy Court held that pursuant to the contracts, the debtor (and therefore the trustee) was not entitled to the payment of any commissions when he had not satisfied his liability to the company defendants and that once this liability was satisfied, the remaining commissions became property of the bankruptcy estate.

In Adversary Proceeding No. 90–0043 (Civil No. 91–4216 on appeal), the Trustee sought to recover commissions withheld by the company defendants after the filing of the bankruptcy petition, but which were attributable to policies sold before the bankruptcy. The Bankruptcy Court held that the trustee, who steps into the shoes of the debtor as of the commencement of the case, was not entitled to recover commissions withheld by the company defendants as long as the debtor had not satisfied his contractual liabilities to them. *In re Tomer*, 128 B.R. at 759. The trustee has appealed this decision.

In Adversary Proceeding No. 90–0044 (Civil No. 91–4220 on appeal), the trustee sought to recover as preferences commissions paid during the 90 days prior to the filing of the bankruptcy petition which were applied by the company defendants to reduce the debtor's roll-up liability. Based on the reasoning of Adversary Proceeding No. 90–0043, the Bankruptcy Court held that the trustee was not entitled to the commissions since the debtor was not entitled to them until his liability to the company defendants was satisfied. Therefore, there was not a transfer of the debtor's property as required under 11 U.S.C. § 547. *In re Tomer*, 128 B.R. at 762. The trustee has appealed this decision.

In Adversary Proceeding No. 90–0045 (Civil No. 91–4198 on appeal), the trustee sought a declaration that commissions attributable to policies submitted prepetition, but paid postpetition were property of the debtor's estate. The Bankruptcy Court held that the trustee was entitled to the commissions (subject to the satisfaction of all liabilities owed to the defendant companies) as property of the bankruptcy estate. *In re Tomer*, 128 B.R. at 761. The debtor has appealed this decision.

## II. DISCUSSION

■ This appeal raises solely issues of law regarding the proper interpretation of

---

4. Included in this latter method are "first-year deferred commissions" (premiums on months 10–12), and "renewal commissions" (commissions on policies renewed beyond the one-year period). *In re Tomer*, 128 B.R. at 749.

5. Under the MILICO agreements, A.L. Williams Corporation and Mapleleaf Insurance Services Inc., were to be indemnified against any loss suffered as a result of the actions of the debtor or his downline hierarchy. *In re Tomer*, 128 B.R. at 750, n. 3.

the contracts between the parties.[6] Where questions of law are concerned, the district court will review the bankruptcy court's ruling *de novo. In re Sanderfoot*, 899 F.2d 598, 600 (7th Cir.1990), *rev'd on other grounds,* — U.S. —, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991); *In re Comer*, 723 F.2d 737, 739 (9th Cir.1984).

At the time of the debtor's bankruptcy, there were a total of seven contracts delineating the relationships between the parties: 1) Massachusetts Indemnity and Life Insurance Company, Agent Agreement ("MILICO Contract"); 2) Mapleleaf Insurance Services, Inc., Commission Agreement ("MAPLELEAF Contract"); 3) My Agreement with A.L. Williams & Associates, Inc. ("A.L. Williams" Contract"); 4) First American National Securities, Inc., Registered Representative's Agreement ("FANS Contract"); 5) A.L. Williams Agreement for Independent Business of Regional Vice President ("RVP Contract"); 6) A.L. Williams Senior Vice–President Agreement ("SVP Contract"); and 7) A.L. Williams & Associates, Inc., Agreement for Independent Business of National Sales Director ("NSD Contract"). *See In re Tomer*, 128 B.R. at 752. Additionally, the contracts contain a choice of law provision which provides that Georgia law is to be applied in interpreting the meaning of the contracts. *See* A.L. Williams Contract, ¶ 17M.[7]

## A. Trustee's Entitlement to Commissions Withheld by Defendants

In Civil No. 91–4216, the trustee seeks to reverse the Bankruptcy Court's ruling that the trustee was not entitled to recover commissions paid postpetition on policies solicited prepetition, but withheld by defendant companies in order to satisfy the debtor's roll-up liability.[8]

The filing of a petition in bankruptcy creates an estate pursuant to 11 U.S.C. § 541. The estate consists of "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1988). It is a fundamental principle of bankruptcy law that the trustee, who steps into the shoes of the debtor at the commencement of the case, can only assert rights the debtor could assert. *See* 4 Collier on Bankruptcy § 541.01, p. 541–6 (15th ed. 1992); *see also Moutsopoulos v. American Mutual Ins. Co.*, 607 F.2d 1185, 1189 (7th Cir.1979). If the debtor's interest in particular property is contingent (or non-existent), then so is the trustee's.

Section 544 of the Bankruptcy Code, referred to as the "strong-arm" clause, can give the bankruptcy trustee greater rights than the debtor's at the commencement of the case under certain circumstances. The section can give the trustee the rights of: 1) a judicial lien creditor; 2) a creditor with a writ of execution; or 3) a bona fide purchaser of real property. See 11 U.S.C. § 544(a)(1)–(3). But the trustee cannot utilize the "strong arm" provisions of § 544 if the threshold requirement, that the debtor have an interest in property, is not met.

Thus, the Court must determine what property interest the debtor had in the payment of commissions when he also had roll-up liability to the defendant companies. Resolution of this depends on whether the satisfaction of the debtor's roll-up liability was a condition precedent to the payment of any commissions under the contracts.

Under Georgia law regarding contract interpretation, the intent of the parties is to be determined from "a consideration of the entire contract; and, if possible, all of its provisions should be so inter-

---

**6.** The MILICO defendants repeatedly refer in their briefs to Judge Meyers' findings of fact regarding the interpretation of the contracts in issue. This characterization is incorrect—questions relating to the interpretations of these contracts are questions of law. *See Woodbridge Place Apartments v. Washington Square Capital,* 965 F.2d 1429, 1439 (7th Cir.1992).

**7.** The company defendants concede that Georgia law applies. *See* Brief of MILICO Defendants, p. 14, n. 11 (Case No. 91–CV–4220, Doc. # 9).

**8.** What *is not being sought* in any of the three appeals is commissions paid postpetition that were also solicited postpetition. These commissions are being paid to Tomer in accordance with the terms of the parties' contracts.

preted as to harmonize with each other." *Morgan Guaranty Trust Co. v. Atlanta Nat'l Real Estate Trust,* 149 Ga.App. 118, 119, 253 S.E.2d 774, 775 (1979), quoting *McCann v. Glynn Lumber Co.,* 199 Ga. 669, 674, 34 S.E.2d 839, 848 (1945). In addition, Georgia law establishes a test of clarity, unambiguity, and definiteness for determining the existence of a condition precedent. *Jerome Distributors, Inc. v. B.L.I. Constr. Co., Inc.,* 142 Ga.App. 776, 777, 237 S.E.2d 13, 13 (1977).[9]

■ The Court holds that the contracts require the satisfaction of the debtor Tomer's roll-up liability as a condition precedent to the payment of commissions. With the roll-up liability unsatisfied, the debtor had no entitlement to the commissions. Consequently, the commissions withheld by the company defendant companies to satisfy this liability were not property of the debtor. Because they were not property of the debtor as of the commencement of the case, they are not property of the bankruptcy estate.

There are numerous provisions contained in the contracts between the parties that support the finding that Tomer was not entitled to any commissions (first-year deferred or renewal) when he owed the company defendants money based on his roll-up liability or any other type of liability.[10] Paragraph 4 of the MILICO Contract, in a section entitled Commission Advance and Chargeback Systems, provides, in pertinent part:

A. Mapleleaf or the Company, as the case may be, will, with the consent of the General Agent, from time to time loan to Agent an advance against Agent's commissions (the "Advance Commission"). The Advance Commission is a loan to Agent. *The outstanding balance of such loan shall be referred to as a "Debit Balance," shall be part of the total Debit Balance of Agent* (collectively, "Agent's Debit Balance") and (i) as long as the Advance Commission is not reclassified as a Chargeback, as defined in paragraph 4B below, such Debit Balance will be repaid only from commissions earned relating to the policy in respect of which such Advance Commission was paid, and (ii) if the Advance Commission is reclassified as a Chargeback, such Debit Balance will be repaid (to the extent possible) as provided in paragraph 4B. *Agent's Debit Balance is Agent's obligation to be repaid by Agent to Mapleleaf or the Company,* as the case may be.

B. *The portion of Agent's Advance Commission paid to Agent but not fully earned* as a result of (i) applications which do not result in the issuance of a policy, (ii) policies which are canceled by the insured, (iii) policies which lapse, (iv) reversal of premium, or (v) misapplication of premium or other error ((i) through (v) being collectively referred to as "Chargebacks") *may be recovered as follows:*

1. *By reducing any Advance Commission* (which might otherwise be paid as contemplated by this paragraph 4) by such percentage as may be agreed to from time to time by the Company and the General Agent *and applying the amount of such reduction to the payment of Agent's Debit Balance to the extent of Agent's outstanding Chargebacks;*

2. *By applying Agent's earned commissions due from Mapleleaf or the Company;* and

3. *By applying to the balance thereof all amounts owing to Agent from the Company, Mapleleaf, The A.L. Williams Corporation or any of their affiliates or from any other Indemnified Party under this Agreement* (all such entities and Indemnified Parties being sometimes referred to herein as "Obligees").

---

9. A condition precedent is defined as "one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." Black's Law Dictionary 266 (5th ed. 1979).

10. The contracts make no relevant distinction between roll-up liability (liability for downline agents) and liability for advance recoveries (liability attributable to Tomer), and neither does the Court.

C. If, *during the term of this Agreement*, the sum of (i) Agent's Debit Balance and (ii) amounts otherwise owed by Agent to Obligees, exceeds limits established from time to time by the Company and the General Agent, *Agent shall, on demand, be obligated to pay Mapleleaf or the Company, as the case may be, such amount as the Company and the General Agent may direct; ...*

MILICO Contract, ¶ 4 (emphasis added). The above provisions demonstrate that Tomer was not entitled to commissions until his liabilities were satisfied. Further, ¶ 4H of the MILICO Contract provides:

Agent understands and agrees that any commissions or other amounts payable to Agent from the Company, Mapleleaf, The A.L. Williams Corporation, or any of their affiliates or the General Agent, under this Agreement, the Prior MILICO Agreement, the Mapleleaf Agreement or otherwise (and the payment thereof to Agent) *shall, at the direction of the Company or Mapleleaf, be subject to, and if required thereunder be reduced in accordance with, the Commission and Chargeback System described in this paragraph 4.*

MILICO Contract, ¶ 4H (emphasis added).

Further evidence that Tomer's entitlement to commissions was conditioned on the satisfaction of his roll-up liability is found in paragraph 9 of the MILICO Contract:

A. If any agent, manager, field manager, or other member of the sales hierarchy upon whose sales Field Manager receives or ever has received commissions ("Subordinate Agent") is terminated by or terminates his representation of the Company with any Debit Balance owed to the Company or Mapleleaf, such Subordinate Agent's Terminated Agent's Balance owing, including but not limited to Chargebacks, to Mapleleaf, the Company, or any other Obligees, *shall first* be reduced by any amounts allocated to such Agent in the escrow account described in paragraph 4F above, *and then, to the extent Terminated Agent's Balance remains, be immediately added to or subtracted from, as the case may be, the Field Manager's earned commission balance. Such Subordinate Agent's Debit Balance may be recovered from the Field Manager by Mapleleaf or the Company, as the case may be, by deducting the Subordinate Agent's Debit Balance and other amounts owing by such Subordinate Agent to Obligees from earned first-year commissions and renewal commissions due or to become due to the Field Manager.* Any subsequent collection from or earned commissions otherwise payable to, such terminated Subordinate Agent will be credited to the Field Manager....

C. *To the extent that the earned commission accounts of subordinate Field Managers, when added to any earned commission accounts of Field Managers subordinate to them, if any, reflect a net debit, the Company or Mapleleaf, as the case may be, shall retain sufficient commissions otherwise payable to Field Manager to cover the sum of such debit balances....*

MILICO Contract, ¶ 9 (emphasis added).[11]

Further evidence of the existence of this condition precedent is found in provisions of the FANS Contract: [12]

3.4 **Deductions from amounts owed to Representative—***Any money and value owed by Representative to FANS, any Negative Balance, and any money and value which has been advanced or credited by or on behalf of FANS to, or for the benefit of, Representative, may be deducted by FANS from any commissions or other money or value then or thereafter owed by FANS to Representative.*

\* \* \* \* \* \*

---

11. Paragraph 7 of the MAPLELEAF Contract is virtually identical to ¶ 9 of the MILICO Contract, as is ¶ 4 of the MAPLELEAF Contract to ¶ 4 of the MILICO Contract.

12. Tomer, at the time of the filing of the petition, did not owe any amount pursuant to the FANS Contract, but these provisions are still relevant to determining the intent of the parties regarding entitlement to commissions when roll-up liability is unsatisfied.

3.5(j) **Limited Liability for Roll Ups from Downline Representatives**—... *[I]n any case where representative or an Upline Representative suffers a Roll Up, the liability for payment of that Roll Up by Representative or Upline Representative shall be limited to deduction by FANS from amounts owed by FANS to Representative and Upline Representative,* and to the Downline Representatives who caused the Roll Up.

FANS Contract, ¶ 3.4, 3.5(j) (emphasis added).[13]

The combination of the contract provisions noted above meet the test of clarity, unambiguity and definiteness required under Georgia law for the finding of a condition precedent.[14] The Court holds that the debtor, Mr. Tomer, had no entitlement to the payment of commissions under the contract(s) unless (or until) all liabilities to the company defendants were satisfied. Therefore, the trustee also had no entitlement to the commissions.[15]

Under similar facts, other courts have reached the same result the Court reaches today. In *American Family Life Assurance Co. v. Parker,* 9 B.R. 447 (Bankr. M.D.Ga.1981), the defendant debtor was an independent contractor selling insurance policies of the plaintiff. In this case, the debtor's employment terminated prior to the bankruptcy filing. *Parker,* 9 B.R. at 448. The employment contract at issue provided that: " 'any sums advanced to the Associate [Defendant] shall create a liability to American Family [Plaintiff] on the part of the Associate to be charged back against earned commissions or payable on demand.' " *Id.* The *Parker* court held

that the renewal commissions are property of the bankruptcy estate. The court further held that:

> [t]he Trustee takes, as of the date of bankruptcy, whatever right Defendant had to receive future renewal commissions. However, the Trustee's right can rise no higher than Defendant's, *and the only right of Defendant under the contract was to be paid any renewal commissions which might remain after defendant's indebtedness to Plaintiff was satisfied.*

*Parker,* 9 B.R. at 450 (emphasis added). *See also In re Sherman,* 627 F.2d 594, 594–95 (2d Cir.1980) (under New York law, debtor was not entitled to further commissions until the amount of renewal commissions exceeded what he had already been paid in advance commissions); *Wiley v. Public Investors Life Ins. Co.,* 498 F.2d 101, 103–05 (5th Cir.1974) (where debtor expressly granted a lien to former employer on future commissions, trustee had no right to renewal commissions until debtor's indebtedness to the company was satisfied); *Mutual Trust Life Ins. Co. v. Wemyss,* 309 F.Supp. 1221, 1231 (S.D.Me.1970) ("the only right of Wemyss under the contract was to be paid any renewal commissions which might remain after his indebtedness to Mutual was satisfied.").

In *First National Bank v. Massachusetts General Life Ins. Co.,* 296 Ark. 28, 752 S.W.2d 1 (1988), the defendant entered into a General Agent's Compensation Agreement with an insurance company, with the contract providing that commissions and bonuses earned by the insurance company would go to reduce the debt owed

---

**13.** There are also indemnification provisions which also illustrate the debtor/Tomer's lack of entitlement to commissions when he had outstanding liabilities. *See* MILICO Contract, ¶ 3D; MAPLELEAF Contract, ¶ 3C; Associates Contract, ¶ 4B.

**14.** The Court notes that after the debtor filed for bankruptcy, he executed a new RVP Contract which superseded prior agreements. The new contract contained an additional provision which provided: "RVP is responsible for all Debit Balance amounts of Agents in RVP's Sales Hierarchy with respect to insurance and other business submitted prior to the termination of

this Agreement *and RVP's vested commissions are subject to periodic reduction to the extent of any such Debit Balance."* RVP Contract, ¶ 7(C)(4) (emphasis added). This provision adds additional evidence of the already clear intent of the parties regarding the debtor's entitlement to commissions when liabilities are unsatisfied.

**15.** Notably, in the oral argument before the Court, the attorney for the trustee conceded that if Mr. Tomer tried to sue the company defendants for this money, he could not do so without first debiting the amount owed. Oral Argument, p. 24.

to the defendant for advanced commissions. The plaintiff bank subsequently obtained an assignment from the insurance company and argued that its interest in commissions and bonuses was superior to that of the defendant. The court held that the bank's interests as an assignee were subject to the same contractual limitation the insurance company had, and therefore the bank's property interest was not superior to the defendant's. *Id.*

The trustee in the instant case argues that a security interest was created because: (1) this was really a "loan" to the debtor; or (2) a contractual right of set-off was created, either of which require perfection pursuant to Article Nine of the Uniform Commercial Code ("UCC"). It is undisputed that the company defendants failed to file a financing statement in order to "perfect their lien". As a result, the argument goes, the company defendants cannot defeat the strong-arm powers of the trustee under § 544 of the Bankruptcy Code. The Court rejects this argument.

Although it is true that the term "loan" is used throughout the Contracts, it does not follow that this creates a lien requiring UCC perfection. The term "loan" is used, no doubt, to "hit home" to the debtor/agent that he is responsible for paying these commissions back to the defendant companies. But the use of this term in the context of these contracts does not create a secured interest in need of UCC perfection. *See In re Sherman,* 627 F.2d 594, 595 (2d Cir.1980) ("appellant's right to refrain from paying ... commissions a second time, commissions which were earned before bankruptcy was filed, hardly falls within the scope of these [UCC] definitions.").

The Court also rejects the trustee's reliance on *Continental American Life Insurance Company v. Griffin,* 251 Ga. 412, 306 S.E.2d 285 (1983), as support for his argument that the contracts establish a right of set-off.[16] In *Griffin,* two questions were certified to the Georgia Supreme Court: (1) Under Georgia law, does Article Nine of the UCC apply to contractual rights of set-off?; and (2) If Article Nine applies, does the contractual right of set-off have priority over a perfected security interest? 251 Ga. at 412, 306 S.E.2d at 286. The Georgia Supreme Court held that Article Nine did apply to contractual rights of set-off, and that the contractual right of set-off did not have priority over a perfected security interest. *Id.*

The *Griffin* case does not set forth the contract provisions involved, but the very premise of *Griffin* is that the insurance agent had a property interest in the commissions which was independent of the insurance company's right to withhold commissions. As such, he was able to assign this right to a third party,[17] who in turn perfected the secured interest, thereby defeating Continental's unsecured set-off claim. 251 Ga. at 414, 306 S.E.2d at 287. In our case, pursuant to the contracts, debtor Tomer has no entitlement to any commissions until after his liabilities to the defendant companies are satisfied. As a result, there is no property interest or property right in existence in which to grant (or subsequently perfect) a security interest.[18] In short, the *Griffin* case is not controlling because it begins at a point beyond the analysis required in this case. The debtor in our case has no property interest in the commissions to begin with—these monies belong to the company defendants and there was no need for them to "perfect this interest" by filing a UCC financing statement in their own funds. *See In re Sherman, supra; see also First National Bank,* 296 Ark. 28, 28–29, 752 S.W.2d 1, 1 (1988) (bank, an assignee of insurance agency's right to commissions, filed a fi-

---

**16.** Set-off is defined as: "[r]emedy employed by defendant to discharge or reduce plaintiff's demand by an opposite one arising from transaction which is extrinsic to plaintiff's cause of action." Black's Law Dictionary 1230 (5th ed. 1979).

**17.** In our case the RVP Contract prohibits the assignment of debtor Tomer's commissions to any third party without the Company's consent. *See* RVP Contract, ¶ 17F.

**18.** The Court notes that *Griffin* was not decided in the bankruptcy context, but was rather a priority dispute involving the assignment for commissions to a third party, who then perfected this secured interest. The *Griffin* case is inapposite on this basis as well.

nancing statement and claimed an interest superior to that of Massachusetts General; court declined to follow *Griffin*, and noted that the bank was overlooking a fundamental principle—that it could not "obtain a property right superior to that of its assignor").

In summary, this court holds that because the debtor Tomer has no entitlement to the payment of commissions until his roll-up liability to the company defendants was satisfied, the trustee, who steps into the shoes of the debtor at the commencement of the case, also has no entitlement to the commissions. Therefore, in Case No. 91–4216, the Court hereby AFFIRMS the decision of the Bankruptcy Court in Adversary Proceeding No. 90–0043.

**B. Trustee's Recovery of Preferential Transfers**

■ In Civil No. 91–CV–4220, the trustee seeks to reverse the Bankruptcy Court's finding that it was not entitled to recover as preferences commissions paid during the 90 days prior to the filing of the bankruptcy petition which were applied by the company defendants to reduce the debtor's roll-up liability.

Section 547(b) of the Bankruptcy Code provides that a "trustee may avoid any transfer of *an interest of the debtor in property* ..." 11 U.S.C. § 547(b) (emphasis added). Because of this Court's ruling in the first appeal, that the debtor had no entitlement to the commissions (and neither did the trustee), this provision does not apply because the withholding of commissions by the company defendants was not a "transfer of the debtor's property" as required by § 547. Therefore, in Case No. 91–CV–4220, the Court hereby AFFIRMS the Bankruptcy Court in Adversary Proceeding No. 90–0044.

**C. Debtor's Entitlement to Commissions Received PostPetition on Policies Written PrePetition**

■ In Civil No. 91–4198, the trustee seeks to affirm a declaration that commissions attributable to policies sold before bankruptcy, but commissions were paid af-

ter bankruptcy were property of the debtor's estate. The Bankruptcy Court held that the trustee was entitled to the commissions as property of the bankruptcy estate (subject to the satisfaction of all liabilities owed to the defendant companies). *In re Tomer*, 128 B.R. at 761. For the reasons detailed below, the Court AFFIRMS the decision of the Bankruptcy Court and holds that the trustee is entitled to commissions paid postpetition on policies solicited prepetition as property of the bankruptcy estate.

The debtor Tomer makes two basic arguments on appeal. First, that the trustee had no "vested" right to the commissions because Tomer had no "vested" right to the commissions at the time of the filing of the bankruptcy petition. Second, that the commissions paid postpetition were the result of Tomer's personal services after the bankruptcy and were therefore exempt from becoming property of the estate pursuant to § 541(a)(6) of the Bankruptcy Code.

Debtor Tomer's first argument revolves around the significance of the "vesting" provisions contained in the contracts between the parties. The RVP Contract, in a section entitled Commissions and Vesting, provides, in pertinent part:

A. RVP [Tomer] acknowledges that [A.L. Williams] is a general agent for MILICO. *RVP acknowledges that all insurance commissions, including advanced or earned, first-year deferred, renewal or escrowed commissions, with respect to insurance underwritten by MILICO will be paid, if at all, to RVP and RVP's Sales Hierarchy directly by MILICO or Mapleleaf, as determined by and in accordance with RVP's MILICO Agent Agreement and Mapleleaf Commission Agreement. . . .* All such insurance and other commissions are not payable and will not be paid by [A.L. Williams]. *If for any reason whatsoever MILICO or Mapleleaf . . . should fail to pay commissions to RVP or RVP's Sales Hierarchy, and if such failure to pay shall not be at the request of [A.L. Williams], then RVP agrees to look*

*solely to MILICO, Mapleleaf ... for such payment, and not to [A.L. Williams].*

B. ... Nothing stated in this Agreement, nor any act or omission of [A.L. Williams], shall make [A.L. Williams] liable to RVP for any commissions to RVP pursuant to RVP's contract with MILICO, Mapleleaf or any Other Company....

C. *To the extent that MILICO or Mapleleaf follows [A.L. Williams] request to pay RVP in accordance with this Section 7C, RVP is hereby vested as to first-year deferred and renewal commissions, if any, to which RVP is otherwise entitled, subject to the following provisions:*

*(1) Vesting shall mean that RVP is entitled, notwithstanding termination of this Agreement, to receive first-year deferred and renewal commissions that become earned on Life Insurance applications submitted by RVP or RVP's Sales Hierarchy prior to such termination.*

(2) Notwithstanding vesting, if there is a violation by RVP of [sections of this agreement relating to noncompete covenants, exclusive use of tradename, indemnification, and proprietary rights] or if there is an act or omission by RVP that (i) causes loss, liability or exposure to [A.L. Williams], MILICO, FANS, [or their agents, representatives, policyholders], or (ii) causes ... harm to the reputation and good name of [A.L. Williams], MILICO, or FANS (such violations, acts or omissions being collectively and individually referred to as "Divesting Events"), then RVP shall be divested upon the occurrence of a Divesting Event.

(3) Although at the time of the termination, RVP may be vested because of the absence of a Divesting Event, thereafter, upon the occurrence of a Divesting Event, RVP shall no longer be vested.

RVP Contract, ¶ 7A, B, C.[19]

The gist of the debtor's "vesting" argument is that because his employment was never terminated, there was never a "request to pay" made pursuant to ¶ 7C quoted above, and the "vesting" provision was never triggered. Therefore, because the debtor's interest in commissions was contingent upon termination and the request to pay, the trustee's interest is contingent also.[20] Although this argument has a familiar ring to it, it must be rejected.

As discussed in the first appeal, § 541 of the Bankruptcy Code provides that the bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The issue is whether the debtor had an entitlement to these commissions (once his outstanding liabilities had been met) as of the time of the filing of the bankruptcy petition.

The debtor incorrectly focuses on the concept of "vesting" as it is defined in Paragraph 7C above as his basis for finding that these commissions cannot be property of the bankrupt estate. Vesting has a very specific definition in these contracts: despite a termination of the contract, Tomer would still be entitled to certain commissions under this vesting provision of the RVP Contract. If the contract is not terminated, however, as is the case here, Tomer is still entitled to commissions directly under his contract with MILICO. The MILICO Contract provides: "[p]rovided Agent is in compliance with the terms, provisions and covenants of this Agreement and the Trademark Licensing Agreement [Associates Contract], the Company *shall pay*

---

**19.** The Associates Contract further provides that:

Agent's entitlement to any insurance commissions is established by the MILICO Agent Agreement and the Mapleleaf Commission Agreement. Agent is not vested as to any commissions and if this Agreement is terminated, Agent has no further right to receive any commissions. Agent may, but has no right to be, granted certain vesting privileges under certain higher level contracts....

Associates Contract, ¶ 15. The RVP Contract quoted at length in the text above is considered a higher level contract.

**20.** As has been noted, Tomer is still employed by the company defendants, and therefore ¶ 7C's vesting provision has not been activated.

commissions and make advances to Agent for services performed hereunder...." MILICO Contract, ¶ 2B (emphasis added); *see also* MAPLELEAF Contract, ¶ 2A; FANS Contract, ¶ 3.1. Therefore, regardless of whether Tomer's right to first-year deferred and renewal commissions is "vested," he nevertheless has an enforceable right to the commissions from MILICO. In short, "vesting" is irrelevant to the issue of whether the commissions constitute an interest in property of the debtor as of the commencement of the case pursuant to § 541.[21] As long as the contracts were still in effect, and the debtor Tomer was an agent in good standing, he had an entitlement to the commissions (once his liabilities were satisfied). Because Tomer was entitled to the commissions at the time of the bankruptcy, then the trustee, who stepped into the shoes of the debtor, was entitled to the commissions as property of the bankruptcy estate. *See Parker*, 9 B.R. 447, 449–50 (renewal commissions paid after bankruptcy were property of the bankruptcy estate); *In re Froid*, 109 B.R. 481, 483 (Bankr.M.D.Fla.1989) (renewal commissions were property of the bankruptcy estate).

■ The second argument debtor Tomer makes is that the commissions paid postpetition are the results of his personal services after the filing of the bankruptcy. The Bankruptcy Code excludes from the estate "earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6). Tomer argues that his right to commissions depends upon his continued efforts and involvement in managing his downline agents and in maintaining good relations with the policyholders after a policy is signed.[22] There is no doubt that the contracts provide for many services to be performed by Mr. Tomer to maintain good relations with the policyholders. But in order to meet the test of exclusion under § 541(a)(6), the "earnings" must accrue, or be the result of, or attributable to, services performed by the debtor after the bankruptcy filing. *See In re Palmer*, 57 B.R. 332, 334–35 (Bankr.W.D.Va.1986).

In this case, the debtor's entitlement is clearly rooted in the pre-bankruptcy period when the policies are issued. *See In re Sloan*, 32 B.R. 607, 611 (Bankr.E.D.N.Y. 1983) ("decisive factor in determining whether postpetition income of the debtor will be deemed property of the estate is whether that income *accrues* from postpetition services of the debtor.") (emphasis added); *see also In re Bluman*, 125 B.R. 359, 366 (Bankr.E.D.N.Y.1991); *In re Froid*, 109 B.R. 481, 483 (Bankr.N.D.Fla. 1989); *In re Marshburn*, 5 B.R. 711, 713–14 (Bankr.D.Colo.1980); *see generally*, 4 Collier on Bankruptcy, ¶ 541.19 (15th ed. 1992). The Court agrees with the reasoning of the Bankruptcy Court that any postpetition personal services rendered by the debtor certainly enhances the value of the prepetition policies. *In re Tomer*, 128 B.R. at 761. But, a review of the contract provisions shows that contrary to the debtor's argument, his entitlement to commissions is not contingent upon the performance of subsequent services.[23] Specifically, the contract provides that if the debtor was to terminate the contract or die, and could not possibly perform any future personal services, the payment of commissions would

---

**21.** The debtor Tomer argues that the vesting rights in the RVP agreement are illusory. First, this argument should be rejected since vesting is not relevant. But even if vesting is relevant, the argument relies on a mistaken interpretation of the contract. Tomer argues that vesting rights are illusory because he cannot enforce them. However, the vesting provision of the RVP Contract states that "[i]f for any reason whatsoever MILICO ... should fail to pay commissions to RVP or RVP's Sales Hierarchy, *and if such failure to pay shall not be at the request of [Associates],* then RVP agrees to look solely to [MILICO] for such payment and not to [Associates]." RVP Contract, ¶ 7A. Therefore, if Associates

fails to issue an instruction to MILICO to pay Tomer the vested commissions, Tomer has a direct action against Associates. If Associates does issue a request to pay, then Tomer would have a direct action against MILICO.

**22.** The RVP Contract, ¶ 3 details the various obligations and responsibilities of an RVP.

**23.** In oral argument before this Court, the Debtor's attorney notes that all issues raised on appeal can be determined from looking solely at the statute and the contract(s). Oral Argument, p. 37. The Court agrees.

still be made to the debtor or his estate.[24] Therefore, under the contracts, the entitlement to the commissions is not contingent upon the performance of any future personal services of the debtor.

The Court holds that at the time of the filing of the bankruptcy petition, the debtor Tomer was entitled to those commissions which exceeded the amount he was liable to the company defendants. Therefore these commissions became property of the bankruptcy estate. The ruling of the Bankruptcy Court in Adversary Proceeding No. 90–0045 is hereby AFFIRMED.

### III. SUMMARY

In Civil No. 91–4216, the Court hereby AFFIRMS the decision of the Bankruptcy Court in Adversary Proceeding No. 90–0043; in Civil No. 91–4220, the Court hereby AFFIRMS the Bankruptcy Court in Adversary Proceeding No. 90–0044; and in Civil No. 91–4198, the Court hereby AFFIRMS the Bankruptcy Court in Adversary Proceeding No. 90–0045. In addition, in Civil No. 91–4198, the Debtor's Motion for Stay of Enforcement of the Bankruptcy Court's Order (Document # 28) is hereby DENIED as moot.

IT IS SO ORDERED.

---

**24.** Paragraph 7C of the RVP Contract provides for the payment of vested commissions following termination of the contract, and ¶ 9 provides for payment of commissions after the death of the RVP.