In re Gregory PASSAFIUME and
Elizabeth Passafiume,
Debtors.

Bankruptcy No. 98–35413(2)7.

United States Bankruptcy Court,
W.D. Kentucky,
Louisville Division.

July 30, 1999.

Harold L. Storment, Louisville, KY, for debtor.

Thomas Frentz, Louisville, KY, trustee.

Steven A. Snow, Louisville, KY, for David Corrie and Northwest Mutual Life Ins. Co.

Darrell Mitchell, Louisville, KY.

### MEMORANDUM–OPINION

J. WENDELL ROBERTS, Bankruptcy Judge.

This matter is before the Court on the Motion of the Debtors, Gregory and Eliza-

beth Passafiume ("the Debtors" or "the Passafiumes"), for Turnover of Funds held by David Corrie, General Agent for Northwestern Mutual Life Insurance Company ("NMLIC"). Debtor Gregory Passafiume worked as an insurance agent for NMLIC and now seeks to have David Corrie ("Corrie") turnover commissions totaling $3,316.33 earned in that employment. Corrie has retained the commissions at issue in repayment of both advances and loans to Passafiume, asserting both the doctrines of set-off and recoupment.

The Court has fully reviewed the pleadings and briefs filed by both parties, and has conducted its own in-depth research on the issues raised by the Motion before it. For the reasons set forth below, the Court finds that Corrie is not entitled to retain the withheld commissions under either the theory of set-off or recoupment. Thus, the Court will by separate Order sustain the Debtors' Motion for Turnover of the Funds to the Debtors.

## FACTS

Prior to the Debtors' bankruptcy on October 2, 1998, Debtor Gregory Passafiume was contractually employed as an insurance sales agent for NMLIC. The exact dates of his employment in that capacity are unclear from the record. Corrie has tendered as an exhibit an NMLIC contract entitled "Full Time Special or Soliciting Agent's Contract," signed by both Passafiume and Corrie. However, the document is undated.

Generating further confusion, it appears as though there may have been more than one agency contract. There are three crucial documents involved in the matter before the Court: (1) an NMLIC loan agreement entitled "Loan Agreement/Cash Advance Agreement or Capital Advance Plan," dated September 10, 1997 ("the Loan Agreement"); (2) a Three Party Finance Agreement and Software License for Link Personal Computer System, executed by NMLIC, Corrie and Passafiume, dated August 5, 1996 ("Au-

gust 5, 1996 Finance Agreement"); and (3) a Three Party Finance Agreement and Software License for Link Personal Computer System, dated August 8, 1997 ("August 8, 1997 Finance Agreement"). The Loan Agreement states that it *supplements* Passafiume's "Basic [Agency] Contract," dated August 29, 1997. However, the two Finance Agreements are dated prior to the date of the referenced Agency Contract, being dated August 5, 1996 and August 8, 1997, respectively. Both Finance Agreements reference Passafiume as "a licensed agent of [NMLIC]." Thus, the Court can only conclude that there must have been one or more agency contracts that preceded the August 29, 1997 Basic Contract. This uncertainty, along with the failure of the parties to tender all pertinent agency contracts, renders it virtually impossible for the Court to ascertain the rights of the relevant parties as established therein.

The parties, nevertheless, agree that as part of the terms of Passafiume's Agency Agreement, he was compensated on the basis of commissions. Passafiume earned commissions on policies that he sold, including commissions on those policies when a renewal premium was paid by the insured. NMLIC paid Passafiume the commissions through Corrie, the General Agent for NMLIC.

Pursuant to the three documents referenced above, the Loan Agreement and the two Financing Agreements, money was loaned to Passafiume. Specifically, the Loan Agreement provided for monthly advances of up to $6,000.00 when Passafiume's commissions for a given month fell below that amount. The Loan Agreement stipulated that Passafiume would be given a loan equal to the amount, if any, by which his commissions fell below the monthly $6,000.00 figure. Pursuant to the August 5, 1996 Financing Agreement, NMLIC through Corrie, loaned Passafiume $4,356.07 to finance his purchase of computer software and equipment intended for use in connection with his sales of

insurance. Pursuant to the August 8, 1997 Financing Agreement, NMLIC, again through Corrie, loaned Passafiume $2,797.87 to finance an additional purchase of computer software and equipment. All three of these agreements provide that the loans made pursuant thereto may be set-off against, or paid through, commissions earned by Passafiume.

The Debtors filed for bankruptcy on October 2, 1998. At that time, Passafiume apparently still owed Corrie pursuant to one or more of these three agreements. Corrie did not file a Proof of Claim. The record does not reflect the amounts of debt, if any, left owed to Corrie pursuant to each of these agreements at the time of bankruptcy. The Debtors' Schedules list four personal loans owed to Corrie, and they fail to reference any of the three agreements.

After the Passafiumes filed their bankruptcy action, Corrie began to withhold Passafiume's renewal commissions. The commissions Corrie has withheld total approximately $3,316.33. It is undisputed that the commissions are all renewal commissions, relating to post-petition renewals of policies Passafiume sold pre-petition. Corrie did not move the Court for Relief from the Automatic Stay. Thus, the Debtors assert that his actions of withholding the commissions due and owing to Passafiume constitute a violation of the automatic stay.

Corrie asserts that he is entitled to withhold the commissions at issue pursuant to the doctrines of set-off or recoupment. He has failed to respond to the Debtors' assertion that his actions are in violation of the automatic stay.

### LEGAL ANALYSIS

The Court has thoroughly reviewed the doctrines of both set-off and recoupment and, for the reason discussed below, finds that Corrie was not entitled to withhold the funds at issue under either theory.

## I. SET–OFF.

The United States Supreme Court has addressed the application of set-off in the context of bankruptcy proceedings in the case of *Citizens Bank v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). Section 553 of the Bankruptcy Code allows for set-off of mutual pre-petition debts between the debtor and a creditor when certain conditions are met. *Id.; In re Ruiz*, 146 B.R. 877 (Bankr.S.D.Fla.1992). In other words, "the right of set-off (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Strumpf*, 516 U.S. at 16, 116 S.Ct. 286.

Section 553(a) reads:

Except as otherwise provided by this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset *a mutual debt owing by such creditor to the debtor that arose before the commencement of the case* under this title *against a claim of such creditor against the debtor that arose before the commencement of the case.*

(emphasis added). Thus, to offset a debt under § 553, there must not only be a mutuality of parties, but also a mutuality of obligations. *In re A.J. Nielson*, 90 B.R. 172, 175 (Bankr.W.D.N.C.1988); *In re Julien Co.*, 136 B.R. 784 (Bankr.W.D.Tenn. 1992). *Both* the creditor's claim against the debtor-in-bankruptcy and the creditor's debt owed to the debtor-in-bankruptcy must have arisen *pre-petition*. *In re Peterson Distrib., Inc.*, 82 F.3d 956 (10th Cir.1996); *Ruiz*, 146 B.R. at 879. Claims which arise post-petition lack the requisite mutuality, even if they arise with regard to work performed pre-petition. *In re B & L Oil Company*, 782 F.2d 155 (10th Cir. 1986); *Ruiz*, 146 B.R. at 879; *Nielson*, 90 B.R. at 175. Section 553 simply "does not permit a creditor to collect a pre-petition debt by withholding payment of a post-petition debt owed to the debtor." *Ruiz*,

146 B.R. at 879; *In re Sluss*, 107 B.R. 599 (Bankr.E.D.Tenn.1989). Thus, to assert set-off in bankruptcy, the claim or debt at issue must have been *absolutely owing* — that is, a definite liability must have already accrued—at the time of the commencement of the bankruptcy proceeding. *Matter of Martin*, 130 B.R. 930 (Bankr. N.D.Ill.1991); *Sluss*, 107 B.R. at 601–02.

■ The post-petition commissions which Corrie has withheld from Passafiume were generated from insurance contracts sold pre-petition. They are solely the product of Passafiume's pre-petition efforts. This fact makes the commissions at issue property of the estate. *In re Tomer*, 128 B.R. 746, 755 (Bankr.S.D.Ill. 1991); *aff'd*, 147 B.R. 461 (S.D.Ill.1992); *Waldschmidt v. CBS, Inc.*, 14 B.R. 309, 310–312 (M.D.Tenn.1981); *In re Malloy*, 2 B.R. 674 (Bankr.M.D.Fla.1980); *Sluss*, 107 B.R. at 603. Nevertheless, Corrie's debt to Passafiume is a post-petition debt. The parties agree that pursuant to the terms of Passafiume's NMLIC Agency Contract, commissions were not payable until the premiums were paid. That is, the debt for such commissions became a definite liability, "absolutely owing" post-bankruptcy. Thus, if a premium was paid post-petition, Corrie's debt for that commission is post-petition. *Ruiz*, 146 B.R. at 879; *Sluss*, 107 B.R. at 603; *See also B & L Oil*, 782 F.2d at 156–57; *Waldschmidt*, 14 B.R. at 314.

■ The result is that Corrie's retention of Passafiume's renewal commissions constitute an attempt to collect Passafiume's pre-petition debt to Corrie by setting-off Corrie's post-petition debt to Passafiume. Section 553 simply does not allow for this and, thus, Corrie's reliance on that section must fail.

## II. *RECOUPMENT.*

■ The doctrine of recoupment has become popular with creditors attempting to avoid the restrictions of set-off under § 553, most commonly the requirement of mutuality of obligation. *Sluss*, 107 B.R. at 602; *Waldschmidt*, 14 B.R. at 314; *Ruiz*,

146 B.R. at 879–80. The primary distinction between set-off and recoupment is that "while set-off under § 553 is limited to instances involving mutuality of obligation, the doctrine of recoupment simply requires the claims to arise from the *same transaction*, and that the amounts recouped not exceed the amount of the original sum owed." *Ruiz*, 146 B.R. at 880 (emphasis added); *Matter of Holford*, 896 F.2d 176 (5th Cir.1990); *B & L Oil*, 782 F.2d at 155; *Sluss*, 107 B.R. at 602.

■ The justification for recoupment is that "where the creditor's claim against the debtor arises from *the same transaction* as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor ..." *In the Matter of United States Abatement Corporation*, 79 F.3d 393, 398 (5th Cir.1996) (*quoting Lee v. Schweiker*, 739 F.2d 870, 875 (3rd Cir. 1984)).

■ Where post-petition revenues are the subject of recoupment, application of the doctrine additionally requires that the post-petition revenue be the sole product of the debtor's *pre-petition* efforts. *Ruiz*, 146 B.R. at 880; *In re Sherman*, 627 F.2d 594 (2nd Cir.1980).

The doctrine has been applied on several occasions in instances where insurance agents have been advanced commissions prior to filing bankruptcy and the creditor, being either the insurer for whom the agent sold policies or the managing agent through whom the agent was compensated, has sought repayment by way of withholding post-petition renewal commissions. *Ruiz*, 146 B.R. at 877; *Sherman*, 627 F.2d at 594; *In re Tomer*, 128 B.R. at 746; *See also Waldschmidt*, 14 B.R. at 309 (Doctrine applied to post-petition royalties found to be based exclusively on pre-petition work product). In each of these cases, the agent was advanced commissions, and thereafter filed for bankruptcy. The entity who advanced the commissions pre-bankruptcy then sought repayment through retention of renewal commissions

paid subsequent to the agent/debtor's bankruptcy filing. The courts in these cases found that the agency agreements in each instance established the agent/debtor's right to receive commissions, as well as allowed both for advancement of commissions and repayment thereof through retention of future commission subsequently earned by the agent/debtor. *Sherman*, 627 F.2d at 594; *Tomer*, 128 B.R. at 746; *Ruiz*, 146 B.R. at 877. Thus, these courts have concluded, the debtor received advances on sales made under the agency agreement and the commissions sought to be retained arose from the same sales under the same agreement. *Sherman*, 627 F.2d at 594; *Tomer*, 128 B.R. at 746; *Ruiz*, 146 B.R. at 877. Consequently, each of these cases held the doctrine of recoupment to be applicable. *Sherman*, 627 F.2d at 594; *Tomer*, 128 B.R. at 746; *Ruiz*, 146 B.R. at 877.

■ The facts of the case at bar are significantly distinguishable. In the present case, the debts owed from Passafiume to Corrie arise from three separate contracts: i.e., the Loan Agreement, the August 5, 1996 Finance Agreement, and the August 8, 1997 Finance Agreement. On the other hand, the debt for renewal commissions owed from Corrie to Passafiume arise from Passafiume's agency contract(s). It appears from the record that Passafiume had at least two agency contracts, and possibly more. Only one has been tendered to the Court, and it is undated. While the Loan Agreement purports by its terms to supplement Passafiume's August 29, 1997 Agency Contract, the two Finance Agreements pre-date that contract. Nevertheless, the two Finance Agreements reference that Passafiume is a licensed agent of NMLIC, thus leading this Court to conclude that Passafiume must have had an agency contract that preceded the August 29, 1997 Contract.

The renewal commissions at issue which Corrie has withheld quite probably have arisen from both of Passafiume's agency contracts, and any others that may have

been in existence. Thus, while the Loan Agreement purports to supplement the August 29, 1997 Agency Contract, that is not the only agency contract under which Passafiume earned commissions.

Moreover, while the Loan Agreement states that it "supplements" the August 29, 1997 Agency Contract, the Court questions whether the loans made pursuant to the Loan Agreement can be considered as arising from the "same transaction" as the commissions which arose under that Agency Contract. The Loan Agreement was executed on a date subsequent to the August 29, 1997 Agency Contract, presumably as an after-thought when the need for a loan and creation of a method for repayment arose. This would hardly seem to qualify as being part of "the same transaction."

The Court also notes that, even if the Loan Agreement were deemed to be part of the same transaction as the August 29, 1997 Contract, it does not purport to supplement any of Passafiume's prior agency contracts. Thus, renewal commissions arising from any prior agency contracts could not possibly be deemed as having arisen from the same transaction as the Loan Agreement. Additionally, the Court notes, all of the agency contracts are without question completely separate transactions from the two Financing Agreements.

In sum, it is clear that the debts owed by Passafiume to Corrie arise from three separate contracts, while the commissions owed by Corrie to Passafiume appear to arise from two or more separate agency contracts. For these reasons, the doctrine of recoupment is unavailable to Corrie. This holding is supported by two cases, *In re Sluss*, 107 B.R. 599 (Bankr.E.D.Tenn. 1989), and *Westinghouse Electric Corporation v. Fidelity Deposit Company*, 63 B.R. 18 (E.D.Pa.1986).

The *Sluss* case is quite similar in many respects to the case at bar. In the *Sluss* case, the debtor was an insurance agent for Massachusetts Mutual Life Insurance

Company. He had a "career contract" which he had entered into with one of the company's general agents, David Harris. That contract entitled the debtor to receive commissions on policies sold, as well as renewal commissions. The Contract also had a provision allowing for Harris to make advancements to the debtor, which Harris was entitled to offset against future commissions earned by the debtor. After a few years, the debtor became a district manager, and entered into a new contract with Harris. Over the course of the debtor's employment, Harris made advances to the debtor, which he sought to recoup once the debtor filed for bankruptcy, by withholding payment of post-petition renewal commissions. *Sluss,* 107 B.R. at 599.

The Bankruptcy Court held that this was not one single transaction, but separate transactions. *Id.* at 603–04. Therefore, the doctrine of recoupment did not apply. The *Sluss* court explained:

> The court assumes that the debt for the commission advances arose at least partly from advance payment of override commissions under the District Manager Contract. Collecting this debt under the District Manager Contract by withholding renewal commissions under the Career Contract is set-off of debts under separate contracts rather than recoupment under a single contract or transaction.

> \*    \*    \*    \*    \*    \*

Thus, to the extent the debtor owes Harris advance override commissions under the District Manager Contract, Harris is asking for set-off of debts under different contracts, not recoupment.

*Id.*

The *Sluss* Court went on to state that Harris could not avail himself of the § 553 set-off provisions, either, as his "debt to the debtor for renewal commissions is clearly a post-petition debt." *Id.* at 603. As discussed at great length above, § 553 does not permit the set-off of pre-petition debts against postpetition debts.

In *Westinghouse Electric Corp.,* the debtor, Enviro–Scope, sold office dividers, equipment and furniture as a dealer for Westinghouse. The debtor billed its customers directly. Upon receiving payment, the debtor retained its agreed upon commission and then remitted the balance to Westinghouse. The debtor became delinquent in its payments to Westinghouse in an amount in excess of $500,000.00. As a result, Westinghouse altered its relationship with the debtor, somewhat, requiring that the debtor act as a sales agent, rather than a dealer. Under that arrangement, Westinghouse billed the customers directly and then paid a commission to the debtor. Westinghouse then applied the commissions to payment of the debtor's outstanding debt. Eventually, the debtor filed for bankruptcy. Thereafter, the debtor continued to earn commissions and Westinghouse continued to apply them as a set-off against the balance of the debt. Westinghouse relied upon the doctrine of recoupment in support of this repayment method. The Bankruptcy Court, however, held that the reciprocal obligations arose from separate transactions and recoupment was, therefore, not available to Westinghouse. *Westinghouse Elec. Corp.,* 63 B.R. at 20. The Court stated:

> The fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, ... does not mean that the two arose from the "same transaction."

*Id.* at 21 (*quoting Lee v. Schweiker,* 739 F.2d 870, 875 (3rd Cir.1984)).

The Court held that the debt owed by the debtor to Westinghouse arose under a relationship whereby the debtor was a Westinghouse dealer, with Westinghouse selling goods directly to the debtor, which then sold them to customers. *Id.* Westinghouse's right to withhold commissions to off set against that debt arose under a separate transaction whereby the debtor was treated as a sales agent, rather than a dealer. *Id.* Accordingly, the Court held that Westinghouse was not entitled to re-

payment through the method of recoupment. *Id.*

These cases support this Court's determination that the reciprocal debts in the case at bar did not arise from the same transaction, but rather multiple transactions. Thus, Corrie is not entitled to avail himself of the doctrine of recoupment. ·

### III. *VIOLATION OF AUTOMATIC STAY.*

■ Corrie has not moved the Court for Relief from the Automatic Stay. While a creditor who properly utilizes recoupment to recover monies due him is not required to seek relief from the automatic stay, a creditor who utilizes § 553 set-off is so required. *Strumpf,* 116 S.Ct. at 289; *Sluss,* 107 B.R. at 602; *Newbery Corp., Inc. v. Fireman's Fund Ins. Co.,* 95 F.3d 1392 (9th Cir.1996); *Collier on Bankruptcy* ¶ 553.03, at 553–15—553–16 n. 5 (15th ed.1995). Thus, even if Corrie had succeeded in establishing his right to set-off under § 553, his retention of the funds at issue would still have constituted an unauthorized retention of property of the estate in violation of the automatic stay. *Strumpf,* 116 S.Ct. at 289; *See also Small Bus. Admin. v. Rinehart,* 887 F.2d 165, 168–69 (8th Cir.1989).

■ This retention of property was not called to the Court's attention, however, until after the Discharge had been entered by the Court on January 12, 1999. A Discharge, pursuant to 11 U.S.C. § 524(a)(2), operates as an injunction against any act to recover or offset any debt against the Debtor. The continued retention by Corrie violates the discharge injunction, however, no request for damages or sanctions has been made.

### CONCLUSION

For the above stated reasons, the Court finds that Creditor David Corrie has engaged in an unauthorized and impermissible retention of post-petition renewal commissions due and owing the Debtors, and will, by separate Order, direct those funds to be turned over to the Debtor.