In re E. Payne **PALMER,** Debtor.

Louis A. **MOVITZ,** Trustee,

v.

E. Payne **PALMER,** Defendant.

Bankruptcy No. B–93–10245–PHX–SSC. Adv. No. 93–1255.

United States Bankruptcy Court, D. Arizona.

Jan. 8, 1994.

Michael P. Lane, Brandes, Lane & Joffe, P.C., Phoenix, AZ, for plaintiff.

John J. Hebert, Phoenix, AZ, for debtor/defendant.

## MEMORANDUM DECISION

SARAH SHARER CURLEY, Bankruptcy Judge.

### Preliminary Statement

On December 27, 1993, LOUIS A. MOVITZ, the Trustee, filed a complaint requesting: (1) the turnover of certain property; (2) an accounting; (3) that the Debtor's discharge be denied under 11 U.S.C. § 727; and (4) that a permanent injunction issue enjoining the Debtor and any person or entity that received certain property of the estate from expending same.

The Complaint reflects that it was served upon Debtor's counsel by mail on December 27, 1993. The Complaint includes an application for an order to show cause as to why the Debtor should not be preliminary enjoined from disposing of or transferring certain estate property.

The Complaint was accompanied by the affidavit of Trustee's counsel, and the memorandum of points and authorities in support of an application for an order to show cause regarding the issuance of a preliminary injunction.

This Judge was not holding Court, or in chambers, when the Complaint and other documents were presented. Another Judge of the Bankruptcy Court, however, reviewed the Complaint and other documents and determined that a sufficient emergency existed to issue an *ex parte* temporary restraining order. The Temporary Restraining Order provided as follows:

Upon the Application for Order to Show Cause Re Preliminary Injunction and Memorandum of Points and Authorities in Support thereof filed by Louis A. Movitz, Trustee and good cause appearing therefor;

IT IS HEREBY ORDERED, prohibiting Debtor from using any funds received from Northwestern Mutual Life as and for renewal commissions on policies of insurance written pre-petition.

IT IS FURTHER ORDERED, directing Debtor to sequester said renewal commissions in a separate interest-bearing account, pending further Order of this Court. This is an *ex parte* temporary restraining Order issued at 11:15 [a.m.] on the above date. It automatically expires 10 days from the above date unless Judge Curley otherwise orders. This case is returned to Judge Curley for all further proceedings.

Although the Temporary Restraining Order was issued at 11:15 a.m. on December 30, Trustee's counsel, despite efforts to do so, was unable to obtain a copy of the Temporary Restraining Order until Monday, January 3, 1994.[1]

The Trustee's counsel provided a copy of the Temporary Restraining Order to Debtor's counsel by facsimile; and when Debtor's counsel stated he did not have a copy of the Complaint and other documents, Trustee's counsel provided same to Debtor's counsel as well.

On January 3, 1994, this Court reviewed the pleadings and determined that the Temporary Restraining Order would expire by its own terms on January 9, 1994 at 11:15 a.m. However, since January 9 was a Sunday, the Temporary Restraining Order would remain in force until Monday, January 10 at 11:15 a.m. Since the Court was scheduled to conduct hearings in Prescott, Arizona on January 10, the Court determined that it either had to have an expedited hearing on whether a preliminary injunction should issue or the parties could consent to extend the Temporary Restraining Order for an additional 10 days.

1. The Clerk's Office closed at noon on December 30 and remained closed on December 31. The Clerk's Office did not reopen until Monday, January 3.

On January 3, 1994, this Court prepared an order scheduling a hearing on the preliminary injunction for January 5, 1994 at 3:30 p.m., including a provision which allowed the parties to continue the hearing for an additional 10 days beyond January 10, 1994, if they so desired. Upon telephonic communication between Trustee's counsel and Debtor's counsel, Debtor's counsel would not consent to an extension of the Temporary Restraining Order.

On January 5, another Judge was hearing various matters on this Judge's calendar, including this matter. The Judge determined that he would have to recuse himself from this matter. After the Judge informed the parties of his decision on recusal, Debtor's counsel apparently stated he still would not consent to a 10–day extension of the Temporary Restraining Order. Therefore, this matter was placed back on this Judge's calendar on January 6, 1994 at 11:00 a.m.

On January 6, the Trustee and his counsel presented evidence in support of their position that a preliminary injunction should issue. The Debtor and his counsel also presented evidence.

The Court permitted Debtor's counsel until the afternoon of January 6 to present the cases which both supported and opposed the Debtor's position. The Court also afforded the parties until 9:00 a.m. on January 7, 1994 to file a memorandum of law in support of their respective positions.

Other than the memorandum of law, the Debtor has filed no other pleadings or documents with the Court.

The parties timely filed the memoranda of law.

This constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052, *Rules of Bankruptcy Procedure.* This is a "core" proceeding and this Court has jurisdiction over this matter. 28 U.S.C. §§ 1334 and 157.

### Factual Discussion

At the January 6, 1994 hearing, the Debtor testified that he was a "self employed entrepreneur". The Debtor has been engaged in two businesses: selling life insurance for Northwestern Mutual Life, Milwaukee, Wisconsin ("NML"), and the development of real estate.

The Debtor has been a life insurance agent with NML since 1964. The agreement that he has with NML is described as exclusive; that is, the Debtor has agreed to place all of his insurance business with NML. Only if the individual does not qualify for insurance with NML may the Debtor place the business with another life insurance company.

The Debtor estimated that he has 150 to 200 corporate and individual customers or clients, with Motorola corporation (not the individual executives which are insured) constituting one of the customers.

The Debtor is a member of the Todd Organization [phonetically spelled] of Evanston, Illinois. The organization is a group of NML agents which provides corporate owned life insurance. If a new corporate executive wants a life insurance policy, the Todd Organization sells the policy, bills the corporation, and the Debtor, as a member, participates in the commission. The Todd Organization also makes all of the necessary contacts concerning the renewal of a policy. If the policy is renewed, the Debtor shares in the renewal commission.

The Debtor testified that NML provides a quality product to its customers. This fact accounts in large part for the low lapse rate of three and one-half percent per annum of NML policies. The Debtor testified that NML has the lowest lapse rate in the industry. Most insureds that hold NML policies wish to renew.

The Debtor testified that after the policies became effective, he did contact the insureds on a monthly basis to perform "hand holding" or engage in similar contacts with the insureds. He felt that this service, as well as the excellent training of NML agents generally and the quality of the NML product, contributed to the fact that most insureds desired to renew their insurance policies.

The Debtor has entered into a new contract with NML, with an effective date of

October 1, 1993.[2] The contract provides that the Debtor shall deal exclusively with NML.[3] The contract provides that it shall terminate upon the happening of certain events, including the termination of the contract between the General Agent and NML or the termination of the contract between the District Agent and NML.[4] In this case, the Debtor had to enter into a new contract in October of 1993, because apparently the General Agent and the District Agent were changed by NML.

The Debtor receives "first year" commissions for selling life insurance to new customers or a new policy to an old customer; and "renewal commissions" for obtaining the renewal of policies by existing customers.

As of September 22, 1993, the Debtor had earned income of $18,338.42 in the sale of life insurance to new customers.[5] The Debtor had also earned additional premium fees on new policies of $420.08.[6]

As of September 22, 1993, the Debtor had also earned (1) commissions on the renewal of existing policies in an amount equal to $17,935.35;[7] (2) the sum of $6,924.40 in additional premium fees on renewal policies;[8] and (3) persistency fees in the amount of $9,162.40.[9]

The Debtor chose a "LRO", or level renewal option, concerning the payment of his renewal commissions. The LRO provides that the Debtor will receive payments biweekly, with NML to provide 24 statements over a calendar year. In certain cases, the company holds back a portion of the commissions. The holdbacks are to protect NML if the policy lapses because of nonpayment of the premium by the insured.

The Debtor received the 24th statement from NML on December 29, 1993. The Debtor also received a check from NML on that date. The check included payment of renewal commissions and the holdback that NML had retained over the last year. The Debtor estimated that he received $22,000 on December 29. Of that amount, the Debtor immediately expended $10,000 to pay unpaid tax liabilities. He retained the sum of $12,000 as a result of the Temporary Restraining Order subsequently taking effect. The Debtor estimated that he receives approximately $1,300 biweekly, which constitutes renewal commissions.

The Debtor testified that he has vested renewal commissions of $142,414.99.[10] These commissions are to be paid over a 10-year period, if all of the policies are renewed by existing customers, the premiums are paid, and the insureds do not die. *The Debtor conceded that the vested commissions will be paid to him irrespective of whether he contacts the insureds to service the policies.* The Debtor believes that the vested renewal commissions can be maximized if the contracts are serviced. He stated that the insurance business is competitive. Some agents are contacting his insureds to see if the insureds wish to purchase a policy from a new company. The Debtor also stated that many of his policies are whole life versus term life insurance. Since term life insurance is cheaper, he felt that the insureds must be contacted as to the advantages of retaining a whole life insurance policy. Given the nature of a whole life insurance policy, the insureds also have questions about the computations of moneys earned, etc., which require greater servicing by an agent such as the Debtor.

Although the Debtor has selected a level renewal option for the payment of vested commissions, he concedes that the option may be changed at the beginning of each 24 biweekly period. Hence, if the Debtor has

---

2. See Exhibit 1 admitted in evidence. All references to exhibits are to those exhibits admitted in evidence on January 6.

3. See Exhibit 1, p. 1, ¶ 6.

4. See Exhibit 1, p. 2, ¶ 19.

5. See Exhibit 2.

6. *Id.*

7. *Id.*

8. *Id.*

9. *Id.* The persistency fees pertain to policies that are over 10 years old and as to which the insured is still living.

10. See Exhibit 2.

decided to continue the same option for 1994, the payment of the vested renewal commissions may be changed in 1995.

The Debtor conceded that if he remained in Arizona and concentrated on selling life insurance he could potentially generate greater "first year" or new policy commissions.

The Debtor stated that he also wished to pursue real estate development. He pursues various projects in Colorado and Arizona. Over the last three to four months, he has traveled to Colorado on approximately three occasions. The Debtor believed that each trip ranged from four to ten days. He is currently a consultant on a project in Colorado to develop a ranch. The project has no financing at this time and only the land has been acquired. The plans for development of the property still require governmental approval. The property also needs to be zoned and have the utilities installed. The Debtor anticipates an April, 1994 date to break ground for the commencement of the development, although the project has not yet obtained financing. Once the project is in the development stage, he anticipates receiving income of $60,000 a year. The Debtor currently expends funds on a monthly basis to pursue this venture in Colorado.

The Debtor also testified that he is working on a project in Payson, Arizona. He is a shareholder of High Chaparral Holdings, Inc., which is the developer of this project. This project is also in the early stages, with no financing.[11]

As to the Debtor's spouse, she currently resides in Beaver Creek, Colorado in a residence owned by the Candace Palmer Limited Partnership.[12] The Debtor is a limited partner in this partnership. The Debtor's spouse graduated from the University of Arizona and was previously employed by International Business Machines ("IBM"). At IBM, she was in the marketing and finance area. Essentially, she sold the IBM product to cus-

tomers. Once a sale was made, she also assisted in determining the manner in which the product would be financed.

As a result of the Debtor filing a bankruptcy petition, she determined to work, once again, outside the home. Her current project is to market and obtain financing for the development of the Colorado ranch property in which the Debtor is also involved. She is not being compensated for the work that she is performing.

The Debtor and his wife currently maintain a residence in Arizona and Colorado. The work the Debtor currently performs on the Colorado ranch project requires that a portion of his monthly expenses be devoted to travel and other business expenses for which he is not currently paid. The Debtor estimates his monthly business expenses are $3,000. His wife also incurs business expenses of $1,000 a month on the ranch project in Colorado.

Because the Debtor returns to Arizona periodically to pursue projects here and to sell life insurance, he also rents a patio home in Scottsdale. The patio home is approximately 2,000 square feet, with three bedrooms and two and one-half baths. The Debtor testified that there are nine months remaining on this lease. He pays $1,400 a month in rent.

The Debtor also supports a daughter attending the University of Colorado and a daughter from a prior marriage attending the University of Arizona.

The Debtor's monthly budget, filed with the Court as Schedule J on October 26, 1993, reflects food expense of $1,000; medical and dental expenses of $300; transportation costs of $300 a month; recreational or entertainment expenses of $300; reserves for the payment of Federal and State taxes of $3,500; and, an installment payment on the automobile of $525 a month.[13] The total

---

11. The Debtor testified that he is the general partner of High Chaparral, a limited partnership. However, the Debtor's Schedules list High Chaparral as a corporation. See Debtor's Schedule B, Personal Property, p. 2, ¶ 12.

12. The Debtor testified that he previously owned the home, but transferred it to the limited partnership in 1989 because of family concerns as to which individuals would inherit his property.

13. See Schedule J, filed with the Court on October 26, 1993.

monthly expenses for the two households are apparently $10,385. The Debtor has net take home pay of $9,600, of which approximately $1,300 is received biweekly by the Debtor as renewal commissions.

The Debtor testified that he received the sum of $60,000 in fees from High Chaparral over the last three years.[14]

The Debtor also testified that he received an annual fee of $10,000 as a general partner of Whispering Ridge.[15] These payments will continue for two more years.

The Debtor continues to maintain a membership in an Arizona Country Club.[16] The Debtor's Schedules state that this membership is nontransferable. However, certainly the Debtor is paying certain expenses to maintain this membership.

The Debtor testified that he owes $50,000 in 1993 income taxes. The Debtor previously applied the $10,000 he received at the end of December 1993 in renewal commissions in payment of a portion of his 1993 tax liability as a result of distributions previously received by him from his Individual Retirement Account ("IRA"). The Debtor estimated that he had previously withdrawn $61,000 from his IRA, generating the substantial tax liability. The Debtor further testified that he had $170,000 remaining in the IRA.

### Legal Discussion

■ The Ninth Circuit's criteria for granting a preliminary injunction are:

(a) combination of probable success on the merits and the possibility of irreparable injury; or

(b) serious questions are raised and the balance of hardship tips sharply in movants favor.

*Big Country Foods, Inc. v. Board of Education of Anchorage School District,* 868 F.2d 1085, 1088 (9th Cir.1989), *citing United States v. Odessa Union Warehouse Co-op.,* 833 F.2d 172, 174 (9th Cir.1987); and *Zepeda*

*v. United States I.N.S.,* 753 F.2d 719 (9th Cir.1983).

#### a. *Probability Of Success On The Merits.*

The Trustee asserts that the vested renewal commissions are property of the bankruptcy estate. Upon receipt of $22,000 in renewal commissions in late December 1993, the Debtor promptly expended $10,000 to pay his tax liabilities. The Trustee believes that only an injunction will prohibit the Debtor from spending the balance of the $12,000 that the Debtor has received at the end of December, and from spending the $1,300 in renewal commissions that he will be receiving biweekly.

■ The bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The intent of this provision is to include all property rights of the Debtor, even if the property right is contingent. *Neuton v. Danning,* 922 F.2d 1379, 1382–1383 (9th Cir.1990) (Debtor's interest in spendthrift trust was held to be property of the estate even though right to receive interest was contingent on debtor surviving present beneficiary.)

The Debtor's right to receive commissions results from a contract. This contract right includes the ability to receive a renewal commission, even if the contract is not serviced or attended to by the Debtor, so long as the policy is renewed, the premium is paid, and the insured does not die. The renewal commissions at issue are those that the Debtor has received, and will receive, postpetition as a result of the renewal of a life insurance policy sold by the Debtor prepetition.

Although the Debtor currently receives these commissions in biweekly payments, the Debtor has conceded that at the beginning of any 24–statement period, he may change the option concerning the receipt of renewal commissions.

---

**14.** The Debtor's Schedules reflect that he received $30,000 in fees from High Chaparral in 1993. Statement of Financial Affairs, p. 1, ¶ 1.

**15.** Although the Debtor's Schedules list an interest in Whispering Ridge, the Schedules also reflect that the Debtor received income of $10,000

constituting "WR Troon Fees". It is unclear if the WR Troon Fees relate to Whispering Ridge. See Schedule B, p. 2, ¶ 12 and Statement of Affairs, p. 1, ¶ 1.

**16.** See Schedule B, p. 4, ¶ 33.

■ Once the bankruptcy petition was filed, the Debtor's contractual right to receive these renewal commissions became property of the bankruptcy estate. As such, the Trustee is now entitled to pursue the contractual right of the Debtor to collect the renewal commissions earned on insurance policies sold prepetition.

■ The Debtor argues that perhaps the renewal commissions are not property of the bankruptcy estate as the commissions may constitute "earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6). However, the Debtor testified that if he did not attend to or service the life insurance policies, yet the insureds nevertheless renewed the policies, paid the premiums, and did not die, the Debtor would receive a renewal commission. In fact, the Debtor conceded that although his contract with NML could be terminated if he failed to meet productivity levels, or any other basic requirement, the Debtor would still be entitled to his renewal commissions if the aforesaid conditions were met.

While it is true that the servicing of the life insurance policies may result in increased renewals, such service only affects the value of the right received by the bankruptcy estate. Servicing of the policies is not required by the contract between the Debtor and NML as a prerequisite to the Debtor receiving the payment of the renewal commissions. To the extent that the Debtor rendered any services concerning the insurance policies for which he now receives renewal commissions, those services were rendered prepetition.

■ Several courts have had the opportunity to address this issue. Those courts which have ruled on this issue have done so after reviewing the contract between the debtor and the insurance company. Generally, the courts have held that if the contract between the debtor and the insurance company requires the debtor to perform ongoing servicing as a prerequisite to receiving the renewal commissions then, and only then,

should the renewal commissions not be considered to be property of the estate. *See In re Kervin,* 19 B.R. 190 (Bankr.S.D.Ala.1982) (Court determined that the receipt of the commissions was conditioned upon the debtor meeting performance requirements and continuing to service accounts; as such, the commissions were not property of the estate). *See also In re Tomer,* 147 B.R. 461 (S.D.Ill. 1992) and *In re Froid,* 109 B.R. 481 (Bankr. M.D.Fla.1989) in which the courts acknowledged that the debtors had performed services postpetition; but because those services were not a prerequisite to receiving the commissions, and the majority of the services had been performed to obtain the original policy, the renewal commissions were property of the estate.[17]

These courts have held that if there is any impediment to the debtor receiving the commissions, be it renewal or otherwise, the trustee has no greater right to receive the commission than the debtor; that is, the trustee stands in the shoes of the debtor. As a result, trustees have been denied the right to receive the renewal commissions which have been pledged to an insurance company to repay advances obtained by the debtor until such time as all loans of the debtor are repaid and the debtor is entitled to the receipt of the commissions. *In re Tomer,* 147 B.R. 461 (S.D.Ill.1992).

■ Based on these cases, the Court has determined that the Trustee has a strong probability of success on the merits, such that a preliminary injunction should issue.

The Debtor has stated that at a subsequent hearing, after discovery has been completed, the Court will conclude that the renewal commissions are not property of the bankruptcy estate. The Debtor believes that any inquiry in the area of what constitutes property of the bankruptcy estate is factually intensive. The Debtor has outlined the proposed remaining factual issues:

1. To what extent are the renewal commissions earned by the performance of postpetition services?

---

17. On a similar issue, if a debtor receives an income tax refund postpetition, the refund will constitute property of the estate to the extent it is attributed to prepetition withholdings. *In re Rash,* 22 B.R. 323 (Bankr.D.Kan.1982).

2. Of the "gross dollars" paid by Northwestern Mutual Life Insurance Company, what portion constitutes "renewal commissions" and what portion constitutes other payments (persistency payments, quality incentive payments, etc.)?

3. To what extent is the payment of the premium a condition precedent to the payment of the renewal commission?

4. What are the other contingencies, if any, which apply to the payment of the renewal commissions and what facts apply to those contingencies? [18]

The Debtor has presented no evidence so far which reflects that any services need to be performed by the Debtor to receive the payment of the renewal commissions. If any services are performed, those services only affect the value of, not the right to receive, the payment.

If the Debtor wishes to present further evidence concerning the "gross dollars" received by the Debtor and what portion of that constitutes renewal commissions, the Debtor may so proceed. However, the testimony reflects that the vast majority of the payments received by the Debtor at year-end, and to be received by the Debtor at the beginning of 1994, constitute, or will constitute, renewal commissions from the prepetition sale of life insurance policies by the Debtor.

The payment of the premium by the insured is apparently required before the Debtor is entitled to a renewal commission. However, NML only has a three and one-half percent lapse rate, which indicates most insureds do renew their policies. Moreover, the Debtor has elected to be paid on a level renewal option basis, i.e. on a biweekly basis. This necessarily means that the Debtor may be entitled to a different payment of a renewal commission, but he has elected to receive a steady stream of income on a monthly basis.

The Debtor has testified that the only other factor to be considered concerning the

payment of renewal commissions is possibly the death of the insured.

Assuming that the aforesaid factors are a contingency, such factors are not predicated on any services to be performed by the Debtor. Moreover, as noted previously, the Trustee succeeds to the right of the Debtor to . receive the payments even if they are contingent. *Neuton v. Danning, supra.*

b. *Irreparable injury.*

The Trustee asserts that the estate will be irreparably harmed if a preliminary injunction is not granted. This contention is based on the fact that Debtor has already spent the sum of $10,000 and will continue to receive the sum of $2,600 a month. If the injunction were not issued, and the Debtor were allowed to continue to receive the renewal commissions until such time as the underlying issues could be determined, the Debtor would have the opportunity to receive and spend these commissions over the next several months. This would injure the estate in that the Debtor has testified that he would be unable to repay a money judgment, if the Court subsequently determined that the renewal commissions were property of the estate.

Conversely, Debtor argues that even if the Court takes six months to conduct a trial and determine the underlying issues, the most the Debtor will receive is $15,600. As there are over $14 million in creditors' claims, "it can hardly be argued that the loss of this amount of money to the estate is either irreparable or material." [19]

The Ninth Circuit has described the test for a preliminary injunction as a sliding scale. *United States v. Odessa Union Warehouse Co-op., supra.* As the probability of success on the merits increases, the requirement to show immediate and irreparable injury decreases. The Court believes that the Trustee has made a strong showing that the renewal commissions paid, and to be paid, on insurance policies sold by the Debtor prepetition are property of this bankruptcy

**18.** See Debtor's Post Hearing Brief, pp. 3 and 4.

**19.** *Debtor's Post Hearing Brief Re: Preliminary Injunction* at p. 5. The Debtor presents a similar

argument to prove that the balance of harm tips in favor of denying the preliminary injunction.

estate. Moreover, the affidavit of Trustee's counsel, filed at the time of the Trustee's Complaint, reflects that Trustee's Counsel attempted to work with Debtor's counsel to sequester the funds being received by the Debtor. The Trustee's counsel believes that the renewal commissions are property of the estate and, as such, must be distributed for the benefit of all creditors and interested parties. The Ninth Circuit has repeatedly emphasized the importance of the priority scheme under the Bankruptcy Code, and that it should not be tampered with by a debtor to achieve the debtor's desired result. *In re B & W Enterprises, Inc.,* 713 F.2d 534, 537 (9th Cir.1983); *In re North American Coin & Currency, Ltd.,* 767 F.2d 1573 (9th Cir.1985), *cert. denied*; *In re Tleel,* 876 F.2d 769 (9th Cir.1989); *In re Technical Knockout Graphics, Inc.,* 833 F.2d 797 (9th Cir.1987).

In fact, Debtor's counsel conceded at the January 6, 1994 hearing that if the renewal commissions were determined to be bankruptcy estate property, the Court could issue an injunction to protect those assets for all creditors and interested parties.[20] Therefore, the Debtor's argument in his Post Hearing Brief that there are over $14 million in claims of the various creditors, in this case, misses the point. This is a Chapter 7 proceeding; and the Trustee is responsible for the administration of the assets of this estate, and determining the proposed distribution to creditors based upon the priorities under the Bankruptcy Code.

The Debtor has acted *postpetition* and already expended, within a few days, the sum of $10,000 to pay income taxes, which are normally nondischargeable under Section 523(a)(1), even though the Debtor is responsible to pay said taxes after he obtains a discharge in bankruptcy in his Chapter 7 proceeding. This reflects that the Court must take immediate action or the Debtor will continue to dissipate any renewal commissions that he receives.[21]

The Court's concerns are further heightened by the following facts: (1) the Debtor maintains two households; (2) he is incurring business expenses on speculative ventures with no immediate prospect for return; (3) the Debtor has borrowed $50,000 from his mother and has received a distribution of $61,000 from his IRA, but has not taken any realistic action to curb the amount of his monthly expenses; (4) the Debtor's spouse has chosen to return to work outside the home, but apparently is working on the same speculative ranch project in Colorado as the Debtor, which project currently does not provide any income to her; (5) the Debtor has a real estate broker's license in Arizona, yet has failed to utilize this license to receive current income; and (6) the Debtor has the ability to pursue the sale of new life insurance policies in Arizona for which he will derive future income that is not property of the bankruptcy estate, yet he has chosen not to so proceed.

Since the Debtor has the sum of $170,000 in an IRA, which is presumably an exempt asset and not part of the bankruptcy estate, the Court concludes that it is not unreasonable to request the Debtor to pursue aggressively ways in which to maximize his income, and that his wife do the same, with the Debtor to make withdrawals on an interim basis from his IRA to cover certain living expenses.

*c. Balancing of the Hardships*

■ For a preliminary injunction to issue, the Court may determine, under the second prong of the Ninth Circuit decisions, whether serious questions have been raised by the Trustee and whether the balancing of the hardship tips sharply in the favor of the Trustee. *Big Country Foods, Inc. v. Board of Education of Anchorage School District,*

---

**20.** For instance, the importance of maintaining bankruptcy estate property for distribution is reflected in the Bankruptcy Code which prohibits creditors or other interested parties from transferring, disposing of, or a placing a lien upon bankruptcy estate property. *See* 11 U.S.C. § 362(a)(3) and (4).

**21.** Courts have criticized debtors which have engaged in prebankruptcy planning and paid such nondischargeable debts *prepetition* with nonexempt assets. *Matter of Swift,* 3 F.3d 929 (5th Cir.1993). In this case, the Debtor has made the payments *postpetition* on such nondischargeable debts.

*supra.* The Court believes the Trustee has made the requisite showing under the first prong of the test. As the criteria are set forth in the disjunctive, the Court will only briefly discuss the second prong of the test.

The Court has already noted that the Trustee has shown a strong probability of success on the merits. In balancing the hardships, the Court has previously discussed the role of the Trustee in administering assets of the bankruptcy estate and establishing a proposed distribution on the claims of creditors. The Trustee has shown that the Debtor has a tendency to dissipate quickly any funds received by the Debtor.

Moreover, the Debtor has chosen to spend moneys on projects that may not come to any fruition. Although the Debtor's counsel stated that the Debtor needed the renewal commissions to live on, it is also clear that the Debtor has previously borrowed money from a family member or made distributions to himself from his IRA to meet his needs. Moreover, the Debtor and his spouse also have the real possibility of earning immediate income from services rendered postpetition, which income is not property of the bankruptcy estate. The Debtor and his spouse have simply chosen not to pursue this avenue more aggressively. In turn, the Trustee is a fiduciary for all creditors and interested parties. If these funds are not held by the Trustee, the Debtor will quickly deplete same. The possibility of the Trustee recovering the funds from the Debtor is difficult given the Debtor's tendency to have his monthly living expenses exceed his monthly income. Any remaining funds of the Debtor have been placed in an IRA, an exempt asset, which the Debtor is also dissipating. To have the Trustee sequester the renewal commissions on an interim basis, pending a hearing on the permanent injunction, is a reasonable solution. The Court concludes that the balancing of the hardships tips sharply in the favor of the Trustee.

### d. Public Policy

The Debtor argues that he is entitled to a fresh start and that the issuance of an injunction, even for the next 30 to 45 days until a hearing on a permanent injunction may be conducted, is a hardship. However, the Court has already shown the ability of the Debtor to resolve his financial difficulty. Moreover, the Court has already discussed the strong public policy argument, as outlined in Ninth Circuit decisions cited herein, that the Trustee must administer assets of the bankruptcy estate for the benefit of the creditors and interested parties; and any distributions should be pursuant to the priority scheme of the Bankruptcy Code.

Based upon the foregoing, the Court shall enter an order granting a preliminary injunction to the Trustee.